**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-02074-WYD-STV

MASTERPIECE CAKESHOP INCORPORATED,
a Colorado corporation; and
JACK PHILLIPS,

      *Plaintiffs*,

v.

AUBREY ELENIS, Director of the Colorado Civil Rights Division, in her
official and individual capacities;
ANTHONY ARAGON, as member of the Colorado Civil Rights
Commission, in his official and individual capacities;
MIGUEL "MICHAEL" RENE ELIAS, as member of the Colorado Civil
Rights Commission, in his official and individual capacities;
CAROL FABRIZIO, as member of the Colorado Civil Rights
Commission, in her official and individual capacities;
CHARLES GARCIA, as member of the Colorado Civil Rights
Commission, in his official and individual capacities;
RITA LEWIS, as member of the Colorado Civil Rights Commission, in
her official and individual capacities;
JESSICA POCOCK, as member of the Colorado Civil Rights
Commission, in her official and individual capacities;
AJAY MENON, as member of the Colorado Civil Rights
Commission, in his official and individual capacities;
CYNTHIA H. COFFMAN, Colorado Attorney General, in her official
capacity; and
JOHN HICKENLOOPER, Colorado Governor, in his official capacity,

      *Defendants*.

---

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND MEMORANDUM OF LAW IN SUPPORT**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT ...................................................................................................................... 7

I.      Phillips is likely to succeed on the merits of his claims ....................................... 8

      A.      Phillips is likely to succeed on his free-exercise claim............................. 8

            1.      Colorado unequally applies CADA against Phillips................................... 9

            2.      Commissioners exhibit bias against Phillips............................................. 11

            3.      Colorado has created a system of individualized exemptions and has violated a hybrid of rights. ....................................................................... 12

      B.      Phillips is likely to succeed on his free-speech claim ............................ 13

            1.      Colorado applies CADA to unlawfully compel expression...................... 13

                  a.      The requested cakes are speech .................................................... 15

                  b.      Phillips objects to the requested cakes' messages ........................ 18

                  c.      Colorado compels speech .............................................................. 18

                  d.      Strict scrutiny applies................................................................... 19

                  e.      Colorado cannot satisfy strict scrutiny......................................... 20

            2.      CADA, as applied and on its face, unlawfully restricts expression.......... 22

      C.      Phillips is likely to succeed on his due-process claim. ......................... 25

II.     The remaining preliminary-injunction factors favor Phillips ........................... 29

CONCLUSION.............................................................................................................. 30

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*American Civil Liberties Union v. Johnson,*
    194 F.3d 1149 (10th Cir. 1999) ...................................................................30

*Anderson v. City of Hermosa Beach,*
    621 F.3d 1051 (9th Cir. 2010) ...............................................................15, 17

*Awad v. Ziriax,*
    670 F.3d 1111 (10th Cir. 2012) ...................................................................30

*Axson-Flynn v. Johnson,*
    356 F.3d 1277 (10th Cir. 2004) ...........................................................8, 12, 13

*Batson v. Kentucky,*
    476 U.S. 79 (1986) .................................................................................27, 28

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ..........................................................................14, 18, 20

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) ...........................................................................15, 22

*Buehrle v. City of Key West,*
    813 F.3d 973 (11th Cir. 2015) ................................................................15, 17

*Caperton v. A.T. Massey Coal Co.,*
    556 U.S. 868 (2009) ...........................................................................25, 27

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ..................................................................................8

*Cohen v. California,*
    403 U.S. 15 (1971) ..................................................................................14

*Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for*
    *Southern California,*
    508 U.S. 602 (1993) ..................................................................................29

*Cressman v. Thompson,*
    719 F.3d 1139 (10th Cir. 2013) ...................................................................16

*Cressman v. Thompson,*
    798 F.3d 938 (10th Cir. 2015) ......................................................14, 15, 16, 18

*Derma Pen, LLC v. 4EverYoung Ltd.*,
   773 F.3d 1117 (10th Cir. 2014) ...................................................................7, 8

*Elrod v. Burns*,
   427 U.S. 347 (1976).................................................................................29, 30

*Employment Division v. Smith*,
   494 U.S. 872 (1990).......................................................................................13

*ETW Corporation v. Jireh Publishing, Inc.*,
   332 F.3d 915 (6th Cir. 2003) .........................................................................17

*Forsyth County v. Nationalist Movement*,
   505 U.S. 123 (1992).................................................................................24, 25

*Gibson v. Berryhill*,
   411 U.S. 564, 577 (1973)...............................................................................29

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006).......................................................................................21

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
   515 U.S. 557 (1995)............................................................................... *passim*

*In re Murchison*,
   349 U.S. 133 (1955).......................................................................................25

*J.E.B. v. Alabama*,
   511 U.S. 127 (1994).......................................................................................28

*Janus v. American Federation of State, County, and Municipal Employees,
   Council 31*,
   138 S. Ct. 2448 (2018)...............................................................13, 14, 19, 22

*Kolender v. Lawson*,
   461 U.S. 352 (1983).......................................................................................24

*Marshall v. Jerrico, Inc.*,
   446 U.S. 238 (1980).................................................................................25, 26

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
   138 S. Ct. 1719 (2018)........................................................................... *passim*

*Matal v. Tam*,
   137 S. Ct. 1744 (2017).............................................................................13, 24

*Miami Herald Publishing Co. v. Tornillo*,
    418 U.S. 241 (1974)................................................................................................14, 17

*National Institute of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)....................................................................................................19

*Pacific Gas and Electric Co. v. Public Utilities Commission of California*,
    475 U.S. 1 (1986).............................................................................................13, 14, 20

*Powers v. Ohio*,
    499 U.S. 400 (1991).......................................................................................................28

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992).........................................................................................20, 23, 24

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015)....................................................................................19, 20, 22

*Riley v. National Federation of the Blind of North Carolina*,
    487 U.S. 781 (1988).................................................................................................17, 19

*Saxe v. State College Area School District*,
    240 F.3d 200 (3d Cir. 2001)...........................................................................................24

*Taylor v. Hayes*,
    418 U.S. 488 (1974).......................................................................................................25

*Texas v. Johnson*,
    491 U.S. 397 (1989).........................................................................................16, 21, 22

*United States v. Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000).......................................................................................................22

*United States v. Stevens*,
    559 U.S. 460 (2010).......................................................................................................24

*Verlo v. Martinez*,
    820 F.3d 1113 (10th Cir. 2016) ...............................................................................29, 30

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943).........................................................................................14, 16, 19

*Ward v. Village of Monroeville, Ohio*,
    409 U.S. 57 (1972).........................................................................................................29

*Williams v. Pennsylvania,*
    136 S. Ct. 1899 (2016) ............................................................................25, 26, 27, 28, 29

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ...........................................................................................21

*Withrow v. Larkin,*
    421 U.S. 35 (1975) ............................................................................................25

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ...........................................................................13, 14, 17

## **Statutes**

Colo. Rev. Stat. § 24-34-301(7) ...........................................................................20

Colo. Rev. Stat. § 24-34-303(1)(b)(I)-(II) ............................................................3

Colo. Rev. Stat. § 24-34-303(1)(b)(I)(B) ...........................................................3, 27

Colo. Rev. Stat. § 24-34-303(1)(b)(II)(A) ..............................................................27

Colo. Rev. Stat. § 24-34-305(3) ...........................................................................11

Colo. Rev. Stat. § 24-34-306(4) .........................................................................28, 29

Colo. Rev. Stat. § 24-34-601(2)(a) ...............................................................2, 3, 6, 23

Colo. Rev. Stat. § 24-34-701 .....................................................................2, 3, 6, 22, 23

Colo. Rev. Stat. § 24-34-705 ............................................................................6, 23

**INTRODUCTION**

Plaintiffs Jack Phillips and Masterpiece Cakeshop (collectively, Phillips) sketch, sculpt, and paint cakes that convey messages. Phillips creates his cakes for all people; it is part of his religious calling to love his neighbors. But his religious beliefs prevent him from expressing messages that violate his conscience. For exercising his faith this way, Defendants (collectively, Colorado) insist on turning his life upside down, trying to punish him again just months after the Supreme Court found that Colorado has been acting with "clear and impermissible hostility toward [his] sincere religious beliefs." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1729 (2018). Colorado's message to Phillips is clear: his religious beliefs aren't welcome in the state. He must either agree to violate his faith or shut down his shop.

Colorado's intolerance toward Phillips is violating three constitutional guarantees. First, Colorado is infringing Phillips's free-exercise rights by acting with hostility toward his religious beliefs and practices. Nothing has changed since the Supreme Court's decision. Colorado continues to treat Phillips unequally, allowing other cake artists to decline cakes that express messages they find objectionable while depriving Phillips of that same freedom. And the Colorado Civil Rights Commission (Commission) still has commissioners who oppose Phillips and his religious exercise. One commissioner has even called him the "cake hater."

Second, Colorado is steamrolling Phillips's free-speech rights. It interprets the Colorado Anti-Discrimination Act (CADA) to demand that Phillips create cakes expressing messages contrary to his faith, including cakes with designs that represent and celebrate a gender transition and that express support for Satan or satanic beliefs. That conflicts with Supreme Court case law that forbids states from applying public-accommodations laws like CADA to force people to

1

express messages they deem objectionable. In addition, Colorado silences Phillips—barring him from telling others about the messages he cannot express and the religious reasons why, through vague and overbroad CADA provisions that threaten jail time.

Third, Colorado is disregarding Phillips's due-process rights. Due process demands an objective appearance of fairness and neutrality. But Colorado's attempt to drag Phillips through another Commission proceeding, one initiated by a lawyer who has harassed Phillips with multiple requests, right after the Supreme Court condemned the state's hostility toward him cannot live up to that stringent standard. Also, recent Supreme Court case law denounces the Commission's procedure of placing commissioners over both the decision to prosecute and the adjudication. Commissioners cannot be both accusers and adjudicators.

Ruling for Phillips will not only protect his conscience but also the conscience of others, such as an African American cake artist asked to create a cross-shaped cake celebrating a religious group that espouses white-supremacist doctrine. At the same time, Colorado will maintain its power to punish business owners who turn customers away simply because of who they are rather than the messages they request. This balance ensures freedom for all.

For all these reasons, Plaintiffs request a preliminary injunction enjoining Defendants and their officers, agents, servants, and employees and any other person in active concert or participation with them from enforcing: (1) Colo. Rev. Stat. § 24-34-601(2)(a) as applied against Plaintiffs for declining to create custom cakes that through words, designs, symbols, themes, or images express messages that conflict with their religious beliefs; (2) Colo. Rev. Stat. §§ 24-34-601(2)(a) and 24-34-701 as applied against Plaintiffs for disclosing, as in Paragraph 270 of the First Amended Verified Complaint, the messages that they cannot in good conscience express

and for explaining the religious reasons why; (3) the final clause in Colo. Rev. Stat. § 24-34-601(2)(a), which bans communications indicating that "an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of" a protected characteristic, and the final clause in Colo. Rev. Stat. § 24-34-701, which contains similar language, on its face or as applied to Plaintiffs; and (4) the non-neutral selection criteria and non-neutral representational interests in Colo. Rev. Stat. § 24-34-303(1)(b)(I)-(II) and the procedures in Colo. Rev. Stat. § 24-34-306 that require the same commissioners to decide whether to prosecute and how to rule in the adjudication against Plaintiffs.

As required by Local Rule 7.1(a), Phillips's counsel conferred via telephone with Colorado's counsel, who indicated that her clients oppose the requested preliminary injunction.

## STATEMENT OF FACTS

Phillips is an expert cake artist and owner of Masterpiece Cakeshop. Am. Compl. ¶¶ 83–85. He is also a Christian who lives to honor and follow Jesus Christ in everything he does, including the operation of his business and creation of his cake art. *Id.* at ¶¶ 95–99, 107. Phillips serves everyone, no matter their protected characteristics. *Id.* at ¶ 2. But he declines to create cakes with messages that violate his faith, including messages that demean LGBT people, express racism, celebrate Halloween, and promote marijuana use. *Id.* at ¶¶ 109–17.

Phillips uses artistic skills such as designing, painting, and sculpting to create expressive cakes. *Id.* at ¶¶ 86–93. When customers request such a cake, Phillips collaborates with them on the design; then he sketches, sculpts, and hand-paints to bring the cake to life. Phillips Decl. ¶¶ 4–9. Next, he places the cake in packaging with the shop's logo, Am. Compl. ¶¶ 135–38, which associates Phillips with and conveys approval for the cake's messages, *id.* at ¶ 139.

In 2012, two customers asked Phillips to create a wedding cake celebrating a same-sex marriage. Phillips Decl. ¶ 11. Phillips declined because the cake's message violated his religious beliefs, but he offered to sell the customers other items in the shop or to create a different cake for them. *Id.* The customers filed a charge of discrimination against Phillips under CADA, and after administrative proceedings, the Commission issued an order punishing him. *Id.* at ¶ 12.

Meanwhile, a man named William Jack asked three other cake shops "to create cakes with images" and religious messages "that conveyed disapproval of same-sex marriage." *Masterpiece*, 138 S. Ct. at 1730. After the shops declined because they deemed the messages offensive, William Jack filed religious-discrimination charges against them. The Colorado Civil Rights Division (Division) found—and the Commission agreed—"that [those shops] acted lawfully in refusing service." *Id.* Through those decisions, Colorado established that it applies CADA using an "offensiveness" rule, which allows cake artists "to decline to create specific messages [they] consider[] offensive," *id.* at 1728—a rule that it did not apply in Phillips's case.

Only a few months ago, the Supreme Court reversed the Commission's ruling in Phillips's case because Colorado acted with hostility toward his faith. *Id.* at 1729. The Court relied on two factors. One was Colorado's unequal treatment of Phillips compared to the three cake artists who declined to express religious messages opposing same-sex marriage. *Id.* at 1730–31. The other was commissioners' bigoted comments about religion, ranging from the notion that certain people of faith are not "welcome in Colorado's business community," to outright animus that referred to Phillips's plea for religious freedom as a "despicable piece[] of rhetoric." *Id.* at 1729.

Phillips continues to exercise his faith by declining to create cakes that convey messages at odds with his beliefs. Am. Compl. ¶¶ 109, 191, 304, 307–23, 327. In 2017, on the day the

Supreme Court announced that it would hear Phillips's case, a Colorado attorney called Masterpiece Cakeshop and requested a custom cake designed with a pink interior and blue exterior to celebrate the anniversary of a gender transition. *Id.* at ¶¶ 184–86. The lawyer said that "the design was a reflection of the fact that [the lawyer] transitioned from male-to-female" and that "the cake was 'to celebrate'" that transition. Ex. 27 at 2.

The shop declined that request not because of who the customer was but because the cake's design expressed messages that conflict with Phillips's faith. Am. Compl. ¶¶ 186–94. The design communicated that sex can be changed and expressed celebration for that idea. Phillips Decl. ¶ 16. But Phillips believes the opposite: that sex is given by God, is biologically determined, and cannot be chosen. *Id.* Masterpiece Cakeshop offered to create a different cake for the lawyer or to sell the lawyer any item available for purchase in the shop. Am. Compl. ¶ 196. After this, the lawyer called the shop at least once and requested a cake celebrating Satan. *Id.* at ¶¶ 311–15.

The lawyer filed a discrimination charge concerning the gender-transition cake, Ex. 24 at 3–4, and the Division issued a probable-cause determination finding that Phillips "violated" CADA, Ex. 27 at 4. On October 9, 2018, the Commission filed a formal complaint claiming that Phillips "denied service to [the lawyer] based on her sexual orientation (transgender status) . . . in a violation of [CADA]." Ex. 28 at 3. The complaint's one-sided rendition of facts is more favorable to the lawyer than even what is recited in the discrimination charge. Am. Compl. ¶¶ 202–04, 232–33. The Commission could have passed on filing its complaint, and the lawyer would have been authorized to file a civil action against Phillips in state court. *Id.* at ¶ 229.

Meanwhile, Phillips has been—and continues to be—hit with a barrage of requests for custom cakes that express messages contrary to his religious beliefs. *Id.* at ¶¶ 304, 327–28. Four

5

of those requests, at least one of which came from the same lawyer who requested the gender-transition cake, *id.* at ¶ 313, sought cakes celebrating or otherwise supporting Satan: (1) a "red and black" design with "an upside down cross, under the head of Lucifer," *id.* at ¶ 308; (2) a "red and black theme and an image of Satan smoking marijuana," *id.* at ¶ 315; (3) a topper with Satan "licking a . . . black Dildo," *id.* at ¶ 318; and (4) "a pentagram" design, *id.* at ¶ 320. Colorado interprets CADA to forbid Phillips from declining these requests. *Id.* at ¶ 325. When discussing this case, Governor Hickenlooper said that "just because you don't agree with someone's religion," you should not "be able to deny them service." Ex. 22 at 8.

Facing Colorado's intolerance and the threat of losing his livelihood, Phillips has begun, and plans to continue, communicating about Colorado's mistreatment of him. Am. Compl. ¶¶ 266–67. He also wants to inform the public about the kinds of messages he cannot express—like messages celebrating Satan or the idea that sex can be changed—and the religious reasons why. *Id.* at ¶¶ 268–70. But CADA's publication bans bar Phillips, with threat of jail time, from announcing that he will decline certain requests or from making some feel "unwelcome." Colo. Rev. Stat. §§ 24-34-601(2)(a), 24-34-701, 24-34-705. Colorado interprets those bans to prohibit Phillips from communicating that he cannot create expressive cakes like the satanic and gender-transition cakes, which has caused him to chill his speech. Am. Compl. ¶¶ 270–71, 278–81.

Colorado's hostility toward Phillips since 2012 has been blatant. Past and current commissioners, all appointed by Governor Hickenlooper and many of whom are connected with an advocacy group—One Colorado—that consistently opposes Phillips, have openly expressed their disapproval of Phillips's religious beliefs and exercise. In 2013, when tweeting about Phillips's first case, past Commissioner Heidi Hess, a current field organizer for One Colorado,

wrote: "Freedom OF religion does NOT mean freedom FOR YOUR religion." *Id.* at ¶¶ 155–56; Ex. 16 at 2. When Hess's term expired, the Governor felt so strongly about keeping her that he attempted to override senate opposition. Am. Compl. ¶ 157. Also, past Commissioner Diann Rice referred to Phillips's reliance on his faith as a "despicable piece[] of rhetoric" akin to "defenses of slavery and the Holocaust," and past Commissioner Raju Jairam said that Phillips "cannot act on his religious beliefs 'if he decides to do business in the state,'" *Masterpiece*, 138 S. Ct. at 1729—a sentiment agreed with by Katina Banks, another former commissioner and former One Colorado board member. Am. Compl. ¶¶ 147–53.

Without discovery or responses to public-records requests, Phillips has already learned of some current commissioners' opposition—and even animus—toward him. When Commissioner Pocock, a former field coordinator for One Colorado, discussed Phillips's first case in a series of 2013 tweets with Hess, she referred to Phillips as the "cake hater." *Id.* at ¶ 259; Ex. 12 at 5. And Commissioner Aragon, a former One Colorado board member and self-described "LGBT activist," posted a Facebook comment referencing the Supreme Court arguments in Phillips's first case with an image of the White House lit up in rainbow colors. Am. Compl. ¶¶ 260–62; Ex. 10 at 2; Warner Decl. ¶ 13. Aragon also serves with another group, the National LGBTQ Task Force, that filed an amicus brief against Phillips. Am. Compl. ¶ 261; Exs. 3–4; Ex. 10 at 3. So despite commissioner changeover, the anti-Phillips sentiment remains.

## ARGUMENT

A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits, (2) irreparable harm, (3) the balance of equities favors an injunction, and (4) an injunction

is consistent with the public interest. *Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1119 (10th Cir. 2014). All four requirements are satisfied here.

**I.      Phillips is likely to succeed on the merits of his claims.**

Phillips raises a free-exercise, free-speech, and due-process claim in support of the requested preliminary injunction. He is likely to succeed on each of those claims.

**A.      Phillips is likely to succeed on his free-exercise claim.**

State action "that is not neutral" toward religion "or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Government fails to act neutrally when enforcement officials manifest open hostility toward religious people or religious claims. *Masterpiece*, 138 S. Ct. at 1729–30. And "[o]fficial action that targets religious conduct for distinctive treatment," *Lukumi*, 508 U.S. at 534—including "[a] rule that is . . . discriminatorily applied to religious conduct," *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004)—is neither neutral nor generally applicable. *See also Masterpiece*, 138 S. Ct. at 1730–31. "The Free Exercise Clause bars even '*subtle* departures from neutrality' on matters of religion," and its protection applies "upon even *slight* suspicion that . . . state [actions] stem from animosity to religion or distrust of its practices." *Id.* at 1731 (quoting *Lukumi*, 508 U.S. at 534, 547) (emphasis added). When government hostility toward religion is blatant and egregious, litigants establish a free-exercise violation without needing to satisfy strict scrutiny. *See id.* at 1729–32.

The Supreme Court just said that Colorado violated these principles by acting with "a clear and impermissible hostility" toward Phillips's faith. *Masterpiece*, 138 S. Ct. at 1729. The Court found "indication[s] of hostility" in (1) Colorado's discriminatory enforcement of CADA

against Phillips and (2) commissioners' comments about Phillips, his faith, and religious freedom. *See id.* at 1729–31. Because those infirmities remain, Phillips should prevail.

### 1.     Colorado unequally applies CADA against Phillips.

In enforcing CADA, Colorado has created an "offensiveness" rule that allows cake artists "to decline to create specific messages [they] consider[] offensive." *Masterpiece*, 138 S. Ct. at 1728. Colorado applied that rule when approving "the refusal of bakers to create cakes with images that conveyed [religious] disapproval of same-sex marriage." *Id.* at 1730. Yet Colorado discriminates in applying that rule, targeting Phillips for exercising his faith while allowing others to refuse messages that they deem offensive. This "difference in treatment between Phillips[] and other cake artists is an "indication of hostility" toward Phillips's religious beliefs. *Id.* at 1730.

The Supreme Court has already held that Colorado applies that rule to discriminate against Phillips. *Id.* at 1730–31. The Court was concerned not only that Colorado punished Phillips while absolving others, but also that it analyzed Phillips's case differently. *Id.* Using an offensiveness rule to treat Phillips worse demeaned his faith by "elevat[ing] one view of what is offensive over another," which "itself sends a signal of official disapproval of [his] religious beliefs." *Id.* at 1731.

Colorado's actions following *Masterpiece* confirm its practice of unequally applying CADA. When Phillips declined to create the requested gender-transition and satanic cakes, he did so not because of the person who requested them but because he considered the messages that they would have conveyed offensive to his faith. Am. Compl. ¶¶ 191–94, 307–24. Yet Colorado maintains that Phillips may not decline those requests. Governor Hickenlooper said as much when he remarked, in reference to this case, that "just because you don't agree with someone's religion," you should not "be able to deny them service." Ex. 22 at 8. And the Commission has

issued a formal complaint insisting that Phillips violated CADA by declining to create the gender-transition cake. Ex. 28 at 3.

Three factors highlight the unequal treatment. First, Colorado told the Supreme Court that cake artists may decline cakes with designs, themes, and symbols—including those that are pro-LGBT—that convey messages offensive to their conscience. Ex. 31 at 35 ("Under the Act, Phillips is free . . . to *decline* to sell cakes with 'pro-gay' designs"); *id.* at 25 (Phillips does not violate CADA if he "would not sell a . . . cake with a particular artistic theme," such as a "cake featuring a symbol of gay pride," "to any customer"). The satanic and gender-transition cakes all sought designs, themes, symbols, or images that expressed messages. Leaving no doubt about this, the lawyer who requested the gender-transition cake told Masterpiece Cakeshop that "the design was a reflection of the fact that [the lawyer] transitioned from male-to-female" and that "the cake was 'to celebrate'" that transition. Ex. 27 at 2. And Colorado has acknowledged that the shop declined that request because Phillips does not want to create designs conveying that sex (male or female) is not "immutable." *Id.* at 3. By ignoring what it told the Supreme Court and prosecuting Phillips anyway, Colorado confirms its double-standard.

Second, Colorado continues its inconsistent reasoning when applying CADA to Phillips. The cake shops that declined the religious messages opposing same-sex marriage did not violate CADA, Colorado explained, because each of them "was willing to sell other products . . . to the prospective customers." *Masterpiece*, 138 S. Ct. at 1730. But in Phillips's first case, "the Commission dismissed [his] willingness to sell [other cakes] to gay and lesbian customers as irrelevant." *Id.* Similarly, both the Division and Commission have ignored that Masterpiece Cakeshop told the lawyer who requested the gender-transition cake that the lawyer "is welcome

to purchase any of the cake shop's premade items or obtain a different custom cake." Ex. 25 at 3; *see also id.* at 6. This disparate analysis is exactly what the Supreme Court condemned.

Third, while Colorado defers to the message-based objections of cake artists whose views it likes, it ignores state law and "*presume[s]*" that Phillips violates CADA when he declines to express certain messages that offend his faith. *Masterpiece*, 138 S. Ct. at 1736–37 (Gorsuch, J., concurring); *see* Colo. Rev. Stat. § 24-34-305(3) (requiring "the commission" and "division" to "presume that the conduct of [the accused] is not unfair or discriminatory"). When the cake artists who were asked to criticize same-sex marriage objected to religious "wording and images," Colorado accepted that and did not presume a violation. *Masterpiece*, 138 S. Ct. at 1730. But when Phillips objected to the gender-transition cake because the design admittedly communicated celebration for the view that sex is not "immutable," Colorado pointed to that fact alone in finding a CADA violation. Ex. 27 at 3–4. That is the antithesis of equal treatment, and it must stop.

## 2. Commissioners exhibit bias against Phillips.

Commissioners, both past and present, have exhibited hostility toward Phillips and his faith. As the Supreme Court found, past commissioners "endorsed" the "inappropriate and dismissive" "view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain" and that "religious beliefs and persons are less than fully welcome in Colorado's business community." *Masterpiece*, 138 S. Ct. at 1729. Also, one former commissioner—with "no objection" from the others—"disparage[d]" Phillips's religion "by describing it as despicable," "characterizing it as . . . insubstantial," and "compar[ing] [his] invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust." *Id.*; *see also* Ex. 21 at 4 (that commissioner maintains even now that she "doesn't regret what she

said"). And another past commissioner who decided Phillips's first case tweeted that "Freedom OF religion does NOT mean freedom FOR YOUR religion." Ex. 16 at 2.

Colorado has done nothing to disavow or correct the Commission's systemic and deep-seated opposition toward Phillips and his faith. Without Phillips having the chance to conduct discovery or even obtain public records, evidence already confirms that it remains. In a brazen show of hostility, Commissioner Pocock publicly referred to Phillips as the "cake hater." Ex. 12 at 5. And Commissioner Aragon demonstrated his personal opposition to Phillips through a rainbow-theme Facebook post about the Supreme Court arguments in Phillips's prior case, Ex. 10 at 2, and his current service with a group—the National LGBTQ Task Force—that filed an amicus brief against Phillips, Exs. 3–4; Ex. 10 at 3. That current commissioners continue to oppose—and express animus toward—Phillips is not surprising. All were selected by the same Governor under the same criteria, *see* Colo. Rev. Stat. § 24-34-303(1)(b)(II)(A), which he used to appoint many who have worked with an advocacy group that opposes Phillips. Commissioner bias against Phillips thus continues. And as in *Masterpiece*, that bias—combined with the unequal treatment—establishes a free-exercise violation without needing to apply strict scrutiny.

### 3.   Colorado has created a system of individualized exemptions and has violated a hybrid of rights.

At the very least, to defeat Phillips's free-exercise claim, Colorado must satisfy strict scrutiny because it has (1) created a system of individualized exemptions under CADA and (2) violated a hybrid of Phillips's rights. *See Axson-Flynn*, 356 F.3d at 1295 (recognizing that strict scrutiny applies to an "individualized exemption" and "hybrid rights").

First, the government establishes "a system of individualized exemptions" when it applies "a subjective test" on a "case-by-case basis" to assess whether particular conduct is forbidden. *Id.*

at 1297. The Supreme Court found that a subjective "good cause" standard is an individualized exemption. *Emp't Div. v. Smith*, 494 U.S. 872, 884 (1990). And the Tenth Circuit said that affording an exemption to one person suffices. *Axson-Flynn*, 356 F.3d at 1298–99. Colorado's offensiveness rule rests on a subjective and viewpoint-discriminatory standard that invites Colorado to consider the facts of each case. *Matal v. Tam*, 137 S. Ct. 1744, 1756 n.5, 1763 (2017) (plurality) (standard based on offensiveness is "highly subjective" and discriminates based on "viewpoint"). And as the prior cases with cake artists show, Colorado applies that rule on a case-by-case basis to reach disparate results. That amounts to a system of individualized exemptions.

Second, the "hybrid rights" doctrine applies "when a free exercise claim is coupled with some other constitutional claim (such a free speech claim)." *Axson-Flynn*, 356 F.3d at 1295. A plaintiff must "show that the companion constitutional claim is 'colorable,'" which requires "a fair probability or likelihood, but not a certitude, of success on the merits." *Id.* at 1297. Because Phillips has a strong likelihood of success on his other claims discussed below, the hybrid-rights doctrine demands strict scrutiny, which, as explained below, Colorado cannot satisfy.

**B.       Phillips is likely to succeed on his free-speech claim.**

The Free Speech Clause protects "both the right to speak freely and the right to refrain from speaking." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Colorado violates those rights (1) by compelling Phillips to create unwanted expression and (2) by restricting his desired speech.

**1.       Colorado applies CADA to unlawfully compel expression.**

"Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command" and is "universally condemned." *Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). That rule forbids Colorado from

forcing citizens to express messages they deem objectionable or from punishing them for declining to express such messages. *See Pac. Gas and Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 20–21 (1986) (*PG&E*) (plurality) (business cannot be forced to include another's speech in its mailing); *Wooley*, 430 U.S. at 717 (citizens cannot be forced to display state motto on license plate); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (newspaper cannot be forced to print politician's writings); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (students cannot be forced to recite pledge or salute flag). Not even public-accommodation laws like CADA can override this freedom. *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572–73 (1995) (parade organizers cannot be forced to include LGBT group's message); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000) (Boy Scouts cannot be forced to keep leader who contradicts group's messages).

The right to be free from compelled speech protects conscience by shielding "the sphere of intellect" and the "individual freedom of mind." *Wooley*, 430 U.S. at 714–15. It ensures that the government cannot force individuals to be "instrument[s] for fostering public adherence to an ideological point of view [they] find[] unacceptable." *Id.* at 715. And it protects "individual dignity," *Cohen v. California*, 403 U.S. 15, 24 (1971), because "[f]orcing free and independent individuals to [express] ideas they find objectionable"—to "betray[] their convictions" in that way—"is always demeaning," *Janus*, 138 S. Ct. at 2464.

"[T]o make out a valid compelled-speech claim, a party must establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action." *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) (*Cressman II*). By requiring Phillips to create the requested satanic and gender-transition cakes, Colorado violates his free-speech rights.

### a.     The requested cakes are speech.

The requested satanic and gender-transition cakes sought designs, themes, symbols, or images that communicated obviously intended messages. Am. Compl. ¶¶ 186–92, 202–04, 307–24. They constitute speech, either artistic expression (i.e., pure speech) or symbolic speech.

*Artistic expression.* "[T]he Constitution looks beyond written or spoken words as mediums of expression," *Hurley*, 515 U.S. at 569, and protects artistic expression as pure speech. "The concept of pure speech is fairly capacious." *Cressman II*, 798 F.3d at 952. It includes "pictures, . . . paintings, drawings, and engravings," "custom-painted clothing," "stained-glass windows," *id.*, and tattoos, *Buehrle v. City of Key West*, 813 F.3d 973, 976 (11th Cir. 2015); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010). The hand-crafted and visually expressive satanic and gender-transition cakes are akin to paintings and sculptures. That Phillips creates using mostly edible materials like icing and fondant rather than ink and clay is of no moment. "[T]he basic principles of freedom of speech . . . do not vary when a new and different medium for communication appears." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011).

Those cakes are a means of expression, on both Phillips's and the customer's part. Phillips uses artistic skills such as designing, painting, and sculpting to create expressive cakes. Am. Compl. ¶¶ 88–93. He intends to and does in fact express messages through those cakes, which is why he declines custom cake requests that convey messages in conflict with his faith. Phillips Decl. ¶ 10. And the customers seeking the satanic and gender-transition cakes also intended messages through their designs and themes. *See Cressman II*, 798 F.3d at 954 (asking whether an image that a compelled speaker objected to displaying was an expressive "act of creativity on the part of legislators" requesting that image). The lawyer who requested the gender-transition cake

said that the pink and blue "design was a reflection of," and intended to celebrate, "the fact that [the lawyer] transitioned from male-to-female." Ex. 27 at 2; *see* Ex. 24 at 4 ("I requested that its color and theme celebrate my transition"). Such a cake is a form of artistic expression.

*Symbolic speech.* At a minimum, the satanic and gender-transition cakes are symbolic speech. Symbolism is an "effective way of communicating ideas," serving as "a short cut from mind to mind." *Barnette*, 319 U.S. at 632. The Supreme Court originally adopted a two-prong test to evaluate whether something is symbolic speech: (1) whether "[a]n intent to convey a particularized message was present"; and (2) whether "the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). *Hurley* later erased the requirement that the message be "particularized." 515 U.S. at 569.

The Tenth Circuit has held that the first prong is satisfied in compelled-speech cases. Since "a compelled speech plaintiff does not *intend* to convey the unwanted messages, but is forced to," the court "view[s] the compulsion aspect of [a] compelled speech claim to satisfy any intent requirement." *Cressman v. Thompson*, 719 F.3d 1139, 1154 n.15 (10th Cir. 2013) (*Cressman I*).

Under the second prong, courts discern the message understood by the reasonable observer who sees the speech. That observer "focuses on context to give meaning to a symbol and is cognizant of . . . the environment in which an expressive act occurs." *Cressman II*, 798 F.3d at 958 (quotation marks and alterations omitted). He knows the "purpose," "motive," and intended "message" of the person who requests the speech. *Id.* at 959–60. Here, the observer of the satanic cakes—bearing images of Satan, devilish color schemes, and satanic symbols—would know that the cakes expressed support for Satan. Am. Compl. ¶ 324. Similarly, those viewing the gender-transition cake—people attending the celebration of the anniversary of the gender

transition—would understand that the pink and blue design reflected the gender transition and expressed celebration for that. *Id.* at ¶ 192. The messages of those cakes would have been understood by their viewers and thus constitute symbolic speech.

As the artist who designs, paints, and sculpts the cakes into form, Phillips's role in creating expressive cakes makes him a speaker. People are protected speakers when they create or distribute expression, even if the message originates with others and the speaker earns money. *See Hurley*, 515 U.S. at 569–70 (parade organizers compiling "multifarious voices" are speakers); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795–98 (1988) (fundraisers paid to recite customers' messages are speakers); *Wooley*, 430 U.S. at 715 (motorists displaying state motto on license plate are speakers); *Tornillo*, 418 U.S. at 258 (newspapers compiling others' writings are speakers). "Protected artistic expression frequently encompasses a sequence of acts by different parties, often in relation to the same [item]. The First Amendment protects the artist who [creates] a piece just as surely as it protects" those who request it. *Buehrle*, 813 F.3d at 977; *accord Anderson*, 621 F.3d at 1061–62. That is why tattooists who create what customers request, *id.*; *Buehrle*, 813 F.3d at 976; and "[p]ublishers" who "disseminat[e] the work of others" are protected by the First Amendment, *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 925 (6th Cir. 2003); *see also Hurley*, 515 U.S. at 574 ("professional publishers").

When Phillips creates a custom cake, he acts much like a painter, sculptor, tattooist, or publisher. He exercises discretion over requests, routinely declining to create cakes that express messages he deems objectionable. Am. Compl. at ¶¶ 109–29, 191, 304–23, 327; Phillips Decl. ¶¶ 8, 17. And once he accepts a request, he collaborates with the client about the best way to convey a desired message, draws a sketch of the cake, sculpts it into form, and decorates it with

painting and sculpting techniques. Am. Compl. ¶¶ 86–94; Phillips Decl. ¶¶ 2–9. His role as an active creator of expressive cakes easily qualifies him as a constitutionally protected speaker.

### b.  Phillips objects to the requested cakes' messages.

The compelled-speech doctrine applies when an individual objects to conveying a message. *Cressman II*, 798 F.3d at 951. It does not apply when someone rejects people simply because of who they are. *Hurley*, 515 U.S. at 572. *Hurley* established this crucial message/person distinction in public-accommodation cases. There, the Court held that the compelled-speech doctrine shielded parade organizers' decision not to express an LGBT group's message through their parade. Critical to the Court's analysis was its recognition that the organizers declined the request because of a "disagreement" with the group's message rather than an "intent to exclude homosexuals as such." *Id.*; *see also Dale*, 530 U.S. at 653 (organizers in *Hurley* did not exclude LGBT group "because of their [members'] sexual orientations," but because of what the group expressed "march[ing] behind a . . . banner"). Because Phillips objects to the messages of the gender-transition and satanic cakes on conscience grounds and would otherwise serve the customers who requested those cakes, compelled-speech principles protect him.

### c.  Colorado compels speech.

The way that Colorado interprets CADA compels Phillips to engage in speech. Colorado is not applying CADA to force Phillips to sell his already-made products, like the cookies available for purchase at his shop, or even to create non-expressive items, such as a plain white sheet cake. It is forcing him to hand-craft custom cakes with designs, symbols, themes, and images that violate his faith. This distinction between a compelled sale of a product and a compelled creation of expression is key to applying the compelled-speech doctrine.

Again, *Hurley* is illustrative. Public-accommodation laws like CADA "do not, as a general matter, violate the First or Fourteenth Amendments." *Hurley*, 515 U.S. at 572. They are constitutional "on [their] face" and in the vast majority of their applications. *Id.* But when states apply those laws to "essentially requir[e]" individuals "to alter" their expression—when they are "applied in [that] peculiar way"—compelled-speech principles provide a refuge. *Id.* Since that is how Colorado applies CADA to Phillips, they are violating his free-speech rights.

### d.      Strict scrutiny applies.

Forcing Phillips to express unwanted messages requires strict scrutiny for two reasons. First, compelling speech "is always demeaning," *Janus*, 138 S. Ct. at 2464, and justifiable "only on even more immediate and urgent grounds than [compelled] silence," *Barnette*, 319 U.S. at 633. Second, Colorado applies CADA based on both content and viewpoint. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2231 (2015) (strict scrutiny applies when a law is content based).

Colorado's content-based application of CADA occurs in two ways. First, the Supreme Court has recognized—and just reaffirmed this past term—that "[m]andating speech that a speaker would not otherwise make necessarily alters . . . content" and constitutes "a content-based regulation of speech." *Riley*, 487 U.S. at 795; *accord Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (similar). Applying CADA to force Phillips to craft the satanic and gender-transition cakes mandates expression that he would not otherwise create. It is thus a content-based application of the law.

Second, "regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S. Ct. at 2227. In compelled-speech cases, this occurs when state action is triggered, and requires a speaker to express another's

message, because of content. *See PG&E*, 475 U.S. at 13–14 (plurality) (awarding one speaker "access" to another's expression because of the first speaker's "views" is "content based"). Colorado compels Phillips to create the satanic and gender-transition cakes because those cakes address topics (religion and transgenderism) that implicate a CADA classification. Were Phillips asked for cakes with messages unrelated one of those classifications, CADA would not apply. Colorado thus applies CADA in a content-based manner. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992) (finding a similar law content based). And since Colorado "is punishing [Phillips] because he refuses to create . . . cakes that express" certain messages, it must satisfy "the most exacting scrutiny." *Masterpiece Cakeshop*, 138 S. Ct. at 1746 (Thomas, J., concurring).

Worse yet, Colorado applies CADA to discriminate based on viewpoint in two ways. First, CADA forbids discrimination because of "transgender status," but does not protect any other gender identity. Colo. Rev. Stat. § 24-34-301(7). So while Colorado forces Phillips to create designs celebrating a gender transition, it does not compel the same for a "cisgender" gender affirmation. Second, Colorado applies its offensiveness rule to allow cake artists to refuse cakes conveying some messages, while punishing Phillips when he declines to express messages that the state favors. Such viewpoint discrimination demands strict scrutiny.

**e.      Colorado cannot satisfy strict scrutiny.**

Strict scrutiny requires Colorado to show that applying CADA in these circumstances "furthers a compelling interest and is narrowly tailored." *Reed*, 135 S. Ct. at 2231. Governments that have applied public-accommodation laws like CADA to infringe First Amendment rights have repeatedly been unable to satisfy constitutional scrutiny. *See, e.g.*, *Hurley*, 515 U.S. at 578–79; *Dale*, 530 U.S. at 659. Colorado fares no better here.

Colorado will assert an interest in eradicating discrimination. Yet that characterization of its interest is too broad. Strict scrutiny "look[s] beyond broadly formulated interests justifying the general applicability of government mandates" to see whether that standard "is satisfied through application of the challenged law" to "the particular" party. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006); *see, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 221–22 (1972) (assessing government's specific interest in forcing Amish children to attend school from ages 14 to 16 rather than its general interest in mandating school attendance). As *Hurley* illustrates, the analysis here focuses not on CADA's general purpose of preventing "denial[s] of access to (or discriminatory treatment in) public accommodations," but on its "apparent object" when "applied to [the] expressive activity" at issue. 515 U.S. at 578.

Colorado, therefore, must show that it has a compelling interest in forcing cake artists who serve all people to violate their conscience by creating custom cakes that express messages they deem objectionable. Unlike most applications of CADA, this has the "apparent object" of forcing cake artists like Phillips to create speech and thus to "modify the content of [their] expression." *Id.* But as *Hurley* said, permitting that would "allow exactly what the general rule of speaker's autonomy forbids." *Id.* Colorado thus cannot satisfy strict scrutiny here.

Colorado does not advance its cause by invoking dignitary concerns. *Hurley* established that eliminating dignitary harm is *not* a compelling state interest where, as here, the harm is caused by a decision not to express a message. "[T]he point of all speech protection . . . is to shield just those choices of content that in someone's eyes are . . . hurtful." *Hurley*, 515 U.S. at 574. Because the offensiveness of an expressive decision cannot be the reason "for according it constitutional protection" and for removing that protection, *Johnson*, 491 U.S. at 409, preventing dignitary

harms is not a compelling basis for infringing the freedom not to speak, *see Masterpiece*, 138 S. Ct. at 1746–47 (Thomas, J. concurring) (collecting cases). Moreover, Colorado has not eliminated dignitary harm, but simply shifted it onto Phillips. As the Supreme Court acknowledged last term, compelling someone to express messages that violate their conscience "is always demeaning" and "universally condemned." *Janus*, 138 S. Ct. at 2463–64.

Nor can Colorado demonstrate narrow tailoring. Its efforts to achieve its asserted interests are vastly underinclusive, which "is alone enough to defeat" narrow tailoring. *Brown*, 564 U.S. at 802; *accord Reed*, 135 S. Ct. at 2231–32. Colorado applies its offensiveness rule to permit cake artists to refuse all sorts of orders. Selectively enforcing that rule to punish Phillips when he declines to create cakes expressing state-favored messages is decidedly underinclusive. Furthermore, less restrictive alternatives exist. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) (state must use "a less restrictive alternative"). For example, Colorado could apply CADA to ban person-based discrimination but to allow the limited class of business owners who create custom expression to decline when they object to communicating a desired message. *See Masterpiece*, 138 S. Ct. at 1728 (affording such protection would be "sufficiently constrained" because there are "innumerable goods and services that no one could argue implicate the First Amendment"). Colorado cannot satisfy strict scrutiny.

### 2.     CADA, as applied and on its face, unlawfully restricts expression.

Colorado applies CADA not only to compel Phillips to express messages but also to restrict his speech. CADA's two publication bans forbid Phillips from publishing, distributing, or displaying any communication (1) "that is intended or calculated to discriminate or actually discriminates against any" protected classification "or against any of the members" of a protected

class, Colo. Rev. Stat. § 24-34-701, (2) "that indicates that . . . services . . . will be . . . denied . . . because of" a protected status, or (3) "that indicates . . . that an individual's patronage or presence . . . is unwelcome, objectionable, unacceptable, or undesirable because of" a protected status, Colo. Rev. Stat. § 24-34-601(2)(a); *see also* Colo. Rev. Stat. § 24-34-701 (similar language). Colorado applies those bans to prohibit Phillips from announcing some messages he will not express through his custom cakes—such as messages promoting Satan or communicating that sex can be changed—and from explaining the religious reasons why he cannot express those views. Am. Compl. ¶¶ 270–71, 278–80. One of those laws even subjects Phillips to criminal penalties including jail time. Colo. Rev. Stat. § 24-34-705. This has caused him to chill his desired speech on his website and in the media. Am. Compl. ¶¶ 270, 281.

These speech restrictions must survive strict scrutiny because they regulate speech based on content and viewpoint. The publication bans bar Phillips from posting that he will not create expressive designs celebrating gender transitions or satanic beliefs, while allowing him to announce that he will not promote, say, the Oakland Raiders. That is a textbook example of a content-based speech regulation. And the viewpoint discrimination occurs in two ways. First, although Phillips cannot post his religious conflict with expressing messages that celebrate gender transitions, he may freely publicize an intent not to promote "cisgender" celebrations. Second, speech suggesting that certain views about religion or transgenderism are "objectionable" or "undesirable" is suppressed, while speech "welcom[ing]" to all religious beliefs and views about gender identity is permitted. Such a viewpoint-based law is not only subject to, but also cannot withstand, strict scrutiny. *See R.A.V.*, 505 U.S. at 391–92 (speech ban incorporating protected classifications was based on content and viewpoint, was subject to strict scrutiny, and could not

survive that demanding standard); *Matal*, 137 S. Ct. at 1764 (plurality) (state has no legitimate "interest in preventing speech expressing ideas that offend").

Moreover, the final clause in the publication bans—the "unwelcome" or "objectionable" provision—is facially unconstitutional because it is vague and overbroad and affords unbridled discretion to enforcement officials. A law is unconstitutionally vague if "ordinary people" are unable to discern what it prohibits. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).[1] Inherently subjective and nebulous concepts like "unwelcome" and "objectionable" do not afford such notice. How is Phillips to know everything he might say that will cause certain groups of people to feel unwelcome? This portion of CADA is void for vagueness.

It is also overbroad. A statute is impermissibly overbroad when a "substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). Other courts have struck down similar language as overbroad. *See, e.g.*, *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) (invalidating policy banning "any unwelcome verbal . . . conduct which offends . . . because of" a protected characteristic). A law that restricts people like Phillips from communicating about their religious beliefs and the kinds of messages that they will not express is unconstitutional in a substantial number of its applications. It cannot stand.

Lastly, the final clause of the publication bans runs afoul of the unbridled-discretion doctrine. That doctrine forbids Colorado from "delegat[ing] overly broad . . . discretion to a government official" because "such discretion has the potential for becoming a means of

---

[1] The void-for-vagueness doctrine is rooted in due process, but because of the close relationship between vagueness, overbreadth, and unbridled discretion, Phillips addresses them together.

suppressing a particular point of view." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). The broad, vague, and undefined terms in CADA's publication bans grant state officials unbridled discretion to silence speech they dislike. That kind of standardless enforcement power is facially unconstitutional.

### C.    Phillips is likely to succeed on his due-process claim.

The Due Process Clause requires a "fair trial," *Withrow v. Larkin*, 421 U.S. 35, 46 (1975), before a "disinterested tribunal," *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). "This applies to administrative agencies which adjudicate." *Withrow*, 421 U.S. at 46.

Due-process cases apply "objective standards that do not require proof of actual bias." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009). Those standards provide that due process is violated when (1) "there is an unconstitutional potential for bias," (2) the average adjudicator in that situation is not "likely to be neutral," or (3) "the risk of actual bias . . . endanger[s] the appearance of neutrality." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905, 1908 (2016) (quotation marks omitted); *see also Taylor v. Hayes*, 418 U.S. 488, 501 (1974) (asking "whether there was . . . a likelihood of bias or an appearance of bias"). "[T]o perform its high function," due process demands that proceedings "satisfy the appearance of justice." *In re Murchison*, 349 U.S. 133, 136 (1955). These "stringent" rules "sometimes bar trial by [decisionmakers] who have no actual bias and who would do their very best to weigh the scales of justice equally." *Taylor*, 418 U.S. at 501.

Due process "preserves both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done," and affording each litigant "assurance that the arbiter is not predisposed to find against him." *Marshall*, 446 U.S. at 242

(quotation marks and citation omitted). "Both the appearance and reality of impartial justice are necessary to the public legitimacy of [a tribunal's] pronouncements and thus to the rule of law itself." *Williams*, 136 S. Ct. at 1909.

Allowing the Commission to adjudicate another case against Phillips, just months after the Supreme Court found that it acted with "a clear and impermissible hostility" toward him, *Masterpiece*, 138 S. Ct. at 1729, would flout due process. The Supreme Court did not mince any words: "religious hostility on the part of the State itself" was infused in the prior "adjudication," *id.* at 1724; and "[t]he Commission gave every appearance of adjudicating Phillips'[s] religious objection based on a negative . . . evaluation" of his beliefs, *id.* at 1731 (quotation marks and citations omitted). Given this and the absence of any steps to correct it, a "potential for bias" assuredly exists, and the requisite "appearance of neutrality" is a fantasy. *Williams*, 136 S. Ct. at 1905, 1908. There can and will be no "public legitimacy" to any ruling in the Commission's pending prosecution. *Id.* at 1909. That alone is enough to establish Phillips's due-process claim.

But there is more. Five other factors firmly establish the due-process violation. First, Colorado has confirmed its continuing bias and hostility by launching its new prosecution of Phillips in disregard of what it told the Supreme Court. Even though Colorado said that cake artists are free to decline requests for cakes with pro-LGBT designs, themes, and symbols, *see supra* at 10, it is now punishing Phillips for doing just that. This about-face smacks of bad faith.

Second, it is not just past commissioners who have displayed outright hostility toward Phillips. *See Masterpiece*, 138 S. Ct. at 1729–30; s*upra* at 6–7. Commissioner Pocock, with her "cake hater" slur, has as well. Ex. 12 at 5. This consistent bias is no accident because all commissioners were appointed by Governor Hickenlooper, who is so intent on stacking the

Commission with people who oppose Phillips that he insisted on keeping one such commissioner despite the senate's refusal to confirm her. Am. Compl. ¶¶ 155–57.

Third, Commissioner Aragon is charged by statute with representing government interests, which in his case are pro-LGBT in nature since he serves as the LGBT Liaison to Denver's Mayor. Colo. Rev. Stat. § 24-34-303(1)(b)(I)(B); Ex. 1 at 1; Ex. 9 at 1–2. Because those statutorily imposed interests will impermissibly "tempt [him] to disregard neutrality," *Caperton*, 556 U.S. at 878, allowing him to participate in Phillips's case violates due process.

It is no answer to say that Pocock and Aragon are only two of six current commissioners. "Due process entitles [Phillips] to a proceeding in which he may present his case with assurance that *no member* of the [tribunal] is predisposed to find against him." *Williams*, 136 S. Ct. at 1910 (quotation marks omitted) (emphasis added). "[E]xperience teaches us that each member's involvement" in "the collective process of deliberation" "plays a part in shaping the . . . ultimate disposition." *Id.* at 1909. Given the actual bias and impermissible interests of some commissioners, due process forecloses the Commission's prosecution.

Fourth, the commissioners are chosen by discriminatory means. A majority of them must be "members of groups of people who have been or who might be discriminated against because of disability, race, creed, color, sex, sexual orientation, national origin, ancestry, marital status, religion, or age." Colo. Rev. Stat. § 24-34-303(1)(b)(II)(A). These selection requirements violate Phillips's right to adjudicators who are "indifferently chosen" by "nondiscriminatory criteria." *Batson v. Kentucky*, 476 U.S. 79, 86–87 (1986).[2] More problematic still, Colorado's practice appears to largely, if not entirely, exclude people of faith who share Phillips's beliefs about issues

---

[2] These criteria violate not only the Due Process Clause but also the Equal Protection Clause.

like marriage, religion, and gender identity. *See id.* at 94 ("[S]ystematic exclusion . . . raises an inference of purposeful discrimination").

Such discriminatory selection practices transform tribunals into "ready weapons for officials to oppress" people with disfavored views. *Id.* at 86 n.8. Sadly, that is what the Commission has become, an agency that targets Phillips and treats him unequally. Also, discriminatory means of composing tribunals "cast[] doubt on the integrity of the . . . process," *Powers v. Ohio*, 499 U.S. 400, 411 (1991), "invite[] cynicism respecting [their] neutrality," and "create the impression . . . that the deck has been stacked in favor of one side," *J.E.B. v. Alabama*, 511 U.S. 127, 140 (1994) (quotation marks omitted). Doubts about the fairness of the Commission are so inescapable that even Governor Hickenlooper was not able to assure the media that "people who come before the [Commission] get a fair shake." Ex. 22 at 8.

Fifth, recent Supreme Court precedent establishes that the Commission's adjudicative process is constitutionally infirm. "[A]n unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case." *Williams*, 136 S. Ct. at 1905. People qualify as "accusers" if they approve a significant prosecutorial decision, even if they do not conduct an investigation or actively participate in the prosecution. *Id.* at 1907. Having approved a decision to prosecute, such individuals "cannot be, in the very nature of things, wholly disinterested in the [outcome]." *Id.* at 1906. There is an impermissible "risk" that they will be "psychologically wedded to [their] previous position." *Id.* (quotation marks omitted).

All commissioners act as both accusers and adjudicators. After a probable-cause finding, commissioners decide whether to prosecute by "determin[ing]" whether "the circumstances warrant" issuing "a written notice and complaint requiring . . . a formal hearing," Colo. Rev. Stat.

§ 24-34-306(4), as they just did in Phillips's case, Ex. 28. Later, the commissioners will review the administrative law judge's decision and "vot[e] on the case," *Masterpiece*, 138 S. Ct. at 1725, which gives them final administrative say on whether Phillips will be punished.

This arrangement, which places the Commission over the decision to begin proceedings *and* the decision to punish the accused, is an affront to due process. The risk is far too great that the Commission will be "psychologically wedded" to its decision to prosecute. *Williams*, 136 S. Ct. at 1906. That risk is especially great in the immediate wake of the Commission's failed attempt to punish Phillips the first time. It would be very embarrassing—to say the least—for the Commission to launch another prosecution only to admit that it was wrong. Thus, the Commission's procedure, particularly as applied to Phillips here, violates due process.

Finally, the availability of "judicial review, de novo or otherwise, . . . at the conclusion of the administrative proceedings" does not cure the denial of due process now. *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973); *see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 618 (1993) ("Even appeal and a trial *de novo* will not cure" an initial denial of due process); *Masterpiece*, 138 S. Ct. at 1751 (Ginsburg, J., dissenting) (the majority found a constitutional violation even though the "proceedings involved several layers of independent decisionmaking," including judicial review). Phillips "is entitled to a neutral and detached [adjudicator] in the first instance." *Ward v. Vill. of Monroeville, Ohio*, 409 U.S. 57, 61–62 (1972). Unless this Court intervenes, Phillips will be stripped of that right.

## II.    The remaining preliminary-injunction factors favor Phillips.

*Irreparable harm.* "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th

Cir. 2016) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). As explained above, Colorado is violating, and will continue to violate, Phillips's free-exercise, free-speech, and due-process rights absent this Court's immediate intervention. When constitutional violations are involved, "no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (quotation marks omitted).

*Balance of equities*. The equities favor Phillips because the law places a premium on protecting constitutional rights. Thus, "the threatened injury to [Phillips's] constitutionally protected [rights] outweighs whatever damage the preliminary injunction may cause" Colorado. *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999). That is particularly true here. Colorado can show no harm to its interests because its offensiveness rule already allows other cake artists to do precisely what the injunction would permit Phillips to do.

*Public interest.* "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Verlo*, 820 F.3d at 1127. Because that is what the requested injunction will accomplish, the public interest lands decidedly on Phillips's side. Accordingly, all of the preliminary-injunction factors support Phillips's request.

## <u>CONCLUSION</u>

Phillips wants to peacefully live out his faith through his work as a cake artist by serving all people while declining to express messages that violate his beliefs. Two administrative prosecutions—marked by unequal treatment of Phillips and commissioners who have demeaned him—leave no doubt that Colorado won't allow it. Phillips seeks the requested preliminary injunction so that he can return to the life he had before Colorado began targeting him.

Respectfully submitted this 25th day of October, 2018.

Attorneys for Plaintiffs:

*s/ James A. Campbell*

Kristen K. Waggoner (Arizona Bar No. 032382)
James A. Campbell (Arizona Bar No. 026737)
Jonathan A. Scruggs (Arizona Bar No. 030505)
Jacob P. Warner (Arizona Bar No. 033894)
Katherine L. Anderson (Arizona Bar No. 033104)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
kwaggoner@ADFlegal.org
jcampbell@ADFlegal.org
jscruggs@ADFlegal.org
jwarner@ADFlegal.org
kanderson@ADFlegal.org

David A. Cortman (Georgia Bar No. 188810)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE, Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org

Nicolle H. Martin (Colorado Bar No. 28737)
7175 W. Jefferson Avenue, Suite 4000
Lakewood, CO 80235
(303) 332-4547
(303) 425-3201 (facsimile)
nicollem@comcast.net

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2018, the foregoing document and all its attachments

were filed with the Clerk of Court using the CM/ECF system, which will send notification of such

filing to the following:

LeeAnn Morrill
First Assistant Attorney General
Public Officials Unit
State Services Section
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6159
Facsimile: (720) 508-6041
leeann.morrill@coag.gov

Grant T. Sullivan
Assistant Solicitor General
Public Officials Unit
State Services Section
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6349
Facsimile: (720) 508-6041
grant.sullivan@coag.gov

Vincent E. Morscher
Senior Assistant Attorney General
Civil Litigation and Employment Law
Section
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: (720) 508-6588
Facsimile: (720) 508-6032
vincent.morscher@coag.gov

Jacquelynn Rich Fredericks
Assistant Attorney General
Higher Education Unit
State Services Section
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6603
Facsimile: (720) 508-6041
jacquelynn.richfredericks@coag.gov

*Attorneys for Defendants*

*s/ James A. Campbell*
James A. Campbell