**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-02074-WYD-STV

MASTERPIECE CAKESHOP INCORPORATED,
a Colorado corporation; and
JACK PHILLIPS,

     *Plaintiffs*,

v.

AUBREY ELENIS, Director of the Colorado Civil Rights Division, in her
official and individual capacities;
ANTHONY ARAGON, as member of the Colorado Civil Rights
Commission, in his official and individual capacities;
MIGUEL "MICHAEL" RENE ELIAS, as member of the Colorado Civil
Rights Commission, in his official and individual capacities;
CAROL FABRIZIO, as member of the Colorado Civil Rights
Commission, in her official and individual capacities;
CHARLES GARCIA, as member of the Colorado Civil Rights
Commission, in his official and individual capacities;
RITA LEWIS, as member of the Colorado Civil Rights Commission, in
her official and individual capacities;
JESSICA POCOCK, as member of the Colorado Civil Rights
Commission, in her official and individual capacities;
AJAY MENON, as member of the Colorado Civil Rights
Commission, in his official and individual capacities; and
PHIL WEISER, Colorado Attorney General, in his official capacity,

     *Defendants*.

---

**PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION
AND MEMORANDUM OF LAW IN SUPPORT**

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 3

ARGUMENT ............................................................................................................ 8

I.      Phillips is likely to succeed on the merits of his claims because the pending state
        proceeding violates his constitutional rights.................................................... 9

        A.      Phillips is likely to succeed on his free-exercise claim because state
                hostility toward his religious beliefs and practices pervades the pending state
                proceeding. ........................................................................................ 9

                1.      The state proceeding treats Phillips unequally........................... 10

                2.      Commissioners involved in the state proceeding have exhibited bias
                        against Phillips and his religious practices. ............................... 13

                3.      The state proceeding applies a system of individualized exemptions
                        and threatens to violate a hybrid of Phillips's rights................. 14

        B.      Phillips is likely to succeed on his free-speech claim because the pending
                state proceeding threatens to unlawfully compel his expression. ......... 15

                a.      The gender-transition cake is speech. ........................... 17

                b.      Phillips declined to create the gender-transition cake
                        because he objected to the messages it would have
                        communicated. ............................................................... 20

                c.      The pending state proceeding threatens to compel Phillips's
                        expression. ................................................................... 20

                d.      Strict scrutiny applies to Phillips's free-speech claim. ......... 21

                e.      Colorado cannot satisfy strict scrutiny........................... 22

        C.      Phillips is likely to succeed on his due-process claim because the risk of
                bias in the pending state proceeding is constitutionally intolerable. ........ 25

II.       The remaining preliminary-injunction factors favor Phillips. .......................................... 28

CONCLUSION .................................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*American Civil Liberties Union v. Johnson,*
194 F.3d 1149 (10th Cir. 1999) ..................................................................................29

*Anderson v. City of Hermosa Beach,*
621 F.3d 1051 (9th Cir. 2010) ...............................................................................17, 19

*Awad v. Ziriax,*
670 F.3d 1111 (10th Cir. 2012) ..................................................................................29

*Axson-Flynn v. Johnson,*
356 F.3d 1277 (10th Cir. 2004) .........................................................................9, 14, 15

*Batson v. Kentucky,*
476 U.S. 79 (1986) .......................................................................................................28

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000) .........................................................................................16, 20, 23

*Brown v. Entertainment Merchants Association,*
564 U.S. 786 (2011) .....................................................................................................17

*Buehrle v. City of Key West,*
813 F.3d 973 (11th Cir. 2015) ...............................................................................17, 19

*Caperton v. A.T. Massey Coal Co.,*
556 U.S. 868 (2009) .....................................................................................................25

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) .......................................................................................................9

*Cohen v. California,*
403 U.S. 15 (1971) .......................................................................................................16

*Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for
Southern California,*
508 U.S. 602 (1993) .....................................................................................................28

*Cressman v. Thompson,*
719 F.3d 1139 (10th Cir. 2013) ..................................................................................18

*Cressman v. Thompson,*
798 F.3d 938 (10th Cir. 2015) ...................................................................16, 17, 18, 20

*Derma Pen, LLC v. 4EverYoung Ltd.*,
    773 F.3d 1117 (10th Cir. 2014) ...................................................................8

*Elrod v. Burns*,
    427 U.S. 347 (1976)....................................................................................28

*Employment Division v. Smith*,
    494 U.S. 872 (1990)....................................................................................15

*ETW Corporation v. Jireh Publishing, Inc.*,
    332 F.3d 915 (6th Cir. 2003) ......................................................................19

*Gibson v. Berryhill*,
    411 U.S. 564, 577 (1973)......................................................................28, 29

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006)....................................................................................23

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995).............................................................................. *passim*

*In re Murchison*,
    349 U.S. 133 (1955)....................................................................................25

*Janus v. American Federation of State, County, and Municipal Employees,*
    *Council 31*,
    138 S. Ct. 2448 (2018)..............................................................15, 16, 21, 24

*Marshall v. Jerrico, Inc.*,
    446 U.S. 238 (1980)....................................................................................25

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
    138 S. Ct. 1719 (2018)........................................................................ *passim*

*Matal v. Tam*,
    137 S. Ct. 1744 (2017)................................................................................15

*Miami Herald Publishing Co. v. Tornillo*,
    418 U.S. 241 (1974)..............................................................................16, 19

*National Institute of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)................................................................................21

*Pacific Gas and Electric Co. v. Public Utilities Commission of California*,
    475 U.S. 1 (1986)..........................................................................15, 16, 22

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)............................................................................................22

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015)..................................................................................21, 22

*Riley v. National Federation of the Blind of North Carolina*,
  487 U.S. 781 (1988)............................................................................................19

*Schrier v. University of Colorado*,
  427 F.3d 1253 (10th Cir. 2005) ........................................................................ 8-9

*Taylor v. Hayes*,
  418 U.S. 488 (1974)............................................................................................25

*Texas v. Johnson*,
  491 U.S. 397 (1989)......................................................................................18, 24

*United States v. Playboy Entertainment Group, Inc.*,
  529 U.S. 803 (2000)............................................................................................24

*Verlo v. Martinez*,
  820 F.3d 1113 (10th Cir. 2016) .....................................................................28, 29

*West Virginia State Board of Education v. Barnette*,
  319 U.S. 624 (1943)..............................................................................16, 18, 21

*Ward v. Village of Monroeville, Ohio*,
  409 U.S. 57 (1972)........................................................................................28, 29

*Williams v. Pennsylvania*,
  136 S. Ct. 1899 (2016)..........................................................................25, 26, 27, 28

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972)............................................................................................23

*Withrow v. Larkin*,
  421 U.S. 35 (1975)..............................................................................................27

*Wooley v. Maynard*,
  430 U.S. 705 (1977)......................................................................................16, 19

## **Statutes**

Colo. Rev. Stat. § 24-4-105(14)(a) ..........................................................................26

Colo. Rev. Stat. § 24-34-301(7) .................................................................................................22

Colo. Rev. Stat. § 24-34-303(1)(b)(I)(B) ..................................................................................27

Colo. Rev. Stat. § 24-34-303(1)(b)(II)(A) .................................................................................28

Colo. Rev. Stat. § 24-34-306(4) ...................................................................................................7

Colo. Rev. Stat. § 24-34-306(11) .................................................................................................7

## **INTRODUCTION**

Plaintiffs Jack Phillips and Masterpiece Cakeshop (collectively, Phillips) sketch, sculpt, and paint custom cakes that convey messages. Phillips creates cakes for all people; it is part of his religious calling to love his neighbors. But his religious beliefs prevent him from creating custom cakes that express messages in violation of his conscience, no matter who requests them. For exercising his faith this way, Defendants (collectively, Colorado) insist on punishing him.

The Supreme Court just rebuked Colorado—the same agencies sued here—for acting with "clear and impermissible hostility toward [Phillips's] sincere religious beliefs." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1729 (2018) (*Masterpiece I*). A key element of that hostility was Colorado's "difference in treatment" between Phillips and other cake shops. *Id.* at 1730. When other shops face discrimination charges for declining to create cakes expressing messages that they deem objectionable and will not communicate for anyone, Colorado issues a no-probable-cause determination and dismisses the charges. But when Phillips does the same thing, Colorado finds probable cause and files a formal complaint against him.

Disregarding the Supreme Court, Colorado continues its hostility toward and unequal treatment of Phillips. This time, the state has issued a probable-cause determination, filed a formal complaint, and begun an administrative proceeding against Phillips for declining to create an admittedly expressive cake, designed pink on the inside and blue on the outside, to reflect and celebrate a gender transition—a message he will not express for anyone. Phillips seeks an order preliminarily enjoining the state proceeding. Allowing that proceeding to continue during this litigation will violate Phillips's constitutional rights in three ways.

1

First, the state proceeding infringes Phillips's free-exercise rights because it reflects Colorado's continuing unconstitutional hostility toward his religious beliefs and practices. This Court has already concluded that that proceeding amounts to more "disparate treatment" of Phillips revealing Colorado's "hostility towards [him], which is sufficient to establish [that the state is] pursuing the discrimination charges against [him] in bad faith, motivated by . . . his religion[]." Doc. 94 at 20–21. And that proceeding has been instituted by state officials who oppose Phillips and his religious exercise and who are complicit in a private citizen's attempt to harass him. One of those state officials has even called Phillips a "hater."

Second, the state proceeding threatens Phillips's free-speech rights. It seeks to punish Phillips for declining to express through his cake art messages celebrating a gender transition in violation of his faith. But Supreme Court case law forbids states from applying their laws—including public-accommodations laws—to force people to express messages they deem objectionable, whether that objection is based on religious or non-religious grounds. Compelled speech of that kind invades the conscience and demeans the compelled speaker.

Third, requiring Phillips to endure the state proceeding would violate his due-process rights. Due process demands both actual fairness and an objective appearance of fairness. Neither exists in the state proceeding. From the unequal treatment already shown by the administrative officials who will adjudicate the case, to the inherent concerns with allowing the same commissioners to act as both prosecutors and adjudicators in the same case, to the open hostility that some of those officials have demonstrated, the state proceeding falls far short of what due process requires.

For all these reasons, Plaintiffs request a preliminary injunction that reads as follows: "Defendants and their officers, agents, servants, and employees and any other person in active concert or participation with them are hereby enjoined from taking any steps to pursue the state administrative proceeding captioned *Scardina v. Masterpiece Cakeshop* while this case remains pending."

As required by Local Rule 7.1(a), Phillips's counsel conferred with Colorado's counsel, who indicated that the state opposes the requested preliminary injunction.

## STATEMENT OF FACTS

Phillips is an expert cake artist and owner of Masterpiece Cakeshop. Am. Compl. ¶¶ 83–85. He is also a Christian who lives to honor and follow Jesus Christ in everything he does, including the operation of his business and creation of his cake art. *Id.* at ¶¶ 95–99, 107. Phillips serves everyone, no matter their protected characteristics. *Id.* at ¶ 2. But he declines to create cakes with messages that violate his faith, including messages that demean LGBT people, express racism, celebrate Halloween, and promote marijuana use. *Id.* at ¶¶ 109–17.

Phillips uses artistic skills such as designing, painting, and sculpting to create expressive cakes. *Id.* at ¶¶ 86–93. When customers request such a cake, Phillips collaborates with them on the design; then he sketches, sculpts, and hand-paints to bring the cake to life. Phillips Decl. ¶¶ 4–9. Next, he places the cake in packaging with the shop's logo, which associates Phillips with and conveys approval for the cake's messages. Am. Compl. ¶¶ 135–37.

In 2012, two customers asked Phillips to create a wedding cake celebrating a same-sex marriage. *Masterpiece I*, 138 S. Ct. at 1724. Phillips declined because the cake's message violated his religious beliefs, but he offered to sell the customers other items in the shop or to create a

different cake for them. *Id.* The customers filed a charge of discrimination against Phillips under

the Colorado Anti-Discrimination Act (CADA). *Id.* at 1725. After an investigation, the Colorado

Civil Rights Division (Division) issued a probable-cause determination against Phillips, and the

Colorado Civil Rights Commission (Commission) filed a formal complaint against him and later

issued an order punishing him. *Id.* at 1725–26.

Meanwhile, a man named William Jack asked three other cake shops "to create cakes with

images" and religious messages "that conveyed disapproval of same-sex marriage." *Id.* at 1730;

*see* Ex. 8 at 2, 7, 12. After the shops declined because they deemed the messages offensive,

William Jack filed religious-discrimination charges against them. The Division found—and the

Commission agreed—"that [those shops] acted lawfully in refusing service." *Masterpiece I*, 138

S. Ct. at 1730. So the Division issued a no-probable-cause determination in those cases, Ex. 8 at

1, 6, 11; and after the complainant appealed, the Commission affirmed, *id.* at 16–18. Through

those decisions, Colorado established that it applies CADA using an "offensiveness" rule, which

allows cake shops to decline to express "messages [they] consider[] offensive," *Masterpiece I*,

138 S. Ct. at 1728—a rule not applied in Phillips's case.

Thereafter, the Supreme Court reversed the Commission's ruling against Phillips because

Colorado acted with hostility toward his faith. *Id.* at 1729. The Court relied on two factors. One

was Colorado's unequal treatment of Phillips compared to the three cake shops that declined to

express religious messages opposing same-sex marriage. *Id.* at 1730–31. The other was

commissioners' bigoted comments about religion, ranging from the notion that certain people of

faith are not "welcome in Colorado's business community," to outright animus that referred to

Phillips's plea for his religious freedom as a "despicable piece[] of rhetoric." *Id.* at 1729.

On the day the Supreme Court announced that it would hear Phillips's case, a Colorado attorney named Autumn Scardina called Masterpiece and requested a custom cake designed with a pink interior and blue exterior to reflect and celebrate a gender transition. Am. Compl. ¶¶ 184–86; Ex. 1 at 3–4; Ex. 4 at 2. The shop declined that request not because of who the customer was but because the cake's design expressed messages that conflict with Phillips's faith. Am. Compl. ¶¶ 186–94. The design communicated that sex can be changed and expressed celebration for that idea. Ex. 1 at 3–4; Phillips Decl. ¶ 14. But Phillips believes the opposite: that sex is given by God, is biologically determined, and cannot be chosen. Phillips Decl. ¶ 14. Masterpiece offered to create a different cake for Scardina or to sell Scardina any item available for purchase in the shop. Am. Compl. ¶ 196; Ex. 2 at 3. After this, Scardina called the shop at least once more and requested a cake celebrating Satan, Am. Compl. ¶¶ 199, 311–15; *compare* Ex. 1 at 3, *with* Ex. 7 at 2, in the midst of Phillips receiving other requests for cakes celebrating Satan, including one with sexual images, Am. Compl. ¶¶ 307–20.

Scardina filed a discrimination charge against Masterpiece. Ex. 1 at 3–4. Repeated statements in the charge made clear to Colorado that Scardina told Masterpiece that the cake's blue and pink design would reflect and celebrate a gender transition:

- "[Masterpiece] refused to prepare my order for a cake with pink interior and blue exterior, which I disclosed was intended for the celebration of my transition from male to female." *Id.* at 3.

- "I wanted my birthday cake to celebrate my transition by having a blue exterior and a pink interior." *Id.* at 4.

- "I requested that its color and theme celebrate my transition from male to female. The woman on the phone told me they do not make cakes celebrating gender changes." *Id.* at 4.

Phillips responded to the charge. Ex. 2 at 1. He told Colorado that the shop declined the request because he does not create custom cakes that express "messages and viewpoints on the subject of sex-changes or gender transitions—whether celebrating or denigrating them—for any customer." *Id.* at 3. Phillips also said that his employee told Scardina that Scardina "is welcome to purchase any of the cake shop's premade items or obtain a different custom cake." *Id.*; *see also id.* at 6. And he told Colorado that it "would violate [his] religious beliefs" if he were forced to express the messages that the gender-transition cake communicated. *Id.* at 5.

The Division sat on a draft of its probable-cause determination for many months, *see* Ex. 31 at 1–4, before issuing it just 24 days after the Supreme Court condemned the state's hostility toward Phillips, *see* Ex. 4 at 1. In that determination, the Division definitively announced that Phillips "violated" CADA by declining Scardina's request. *Id.* at 4. On average, the Division finds probable cause in less than 3 percent of its public-accommodation cases. *See* Ex. 9 at 14.

The probable-cause determination acknowledged that (1) Scardina told Masterpiece that the cake's "design was a reflection of the fact that [Scardina] transitioned from male-to-female," and (2) Masterpiece's representative recalled Scardina saying that the cake was "to celebrate a sex-change from male to female." Ex. 4 at 2. The Division also recognized that Phillips will not create custom expressive cakes that celebrate "sex-changes or gender transitions" or contradict his belief that sex is "immutable." *Id.* at 3. The Division offered only one reason for concluding that Phillips engaged in unlawful status-based discrimination against Scardina: because his faith prevents him from expressing through his cake art "the idea that a person's sex is anything other than an immutable God-given biological reality." *Id.* at 3–4.

A few months later, the Commission began its adjudicative proceeding by filing a formal complaint declaring that Phillips "denied service to Scardina based on her . . . transgender status[]" in violation of CADA. Ex. 5 ¶ 15. The complaint recognized that (1) Scardina told Masterpiece that the cake's "design was a reflection of the fact that [Scardina] had transitioned from male to female" and (2) Masterpiece declined the request "because it does not make cakes to celebrate a sex-change." *Id.* ¶ 6. The Commission could have passed on filing its complaint, *see* Colo. Rev. Stat. § 24-34-306(4) (allowing the Commission to determine whether "circumstances warrant" moving forward); and Scardina would have had the right to file a civil action against Phillips in state court, *see* Colo. Rev. Stat. § 24-34-306(11).

It is no surprise that the Commission filed the formal complaint because its officials' hostility toward Phillips since 2012 has been blatant. Past and current commissioners, all appointed by the same governor and many of whom are connected with an advocacy group—One Colorado—that consistently opposes Phillips, *see* Exs. 11–12, have openly expressed their disapproval of Phillips's religious beliefs and exercise. In 2013, when tweeting about Phillips's first case, past Commissioner Heidi Hess, a current field organizer for One Colorado, *see* Ex. 14 at 2, wrote: "Freedom OF religion does NOT mean freedom FOR YOUR religion." Ex. 15 at 2. Also, former Commissioner Diann Rice—without "any regrets," Ex. 20 at 1—referred to Phillips's reliance on his faith as a "despicable piece[] of rhetoric" akin to "defenses of slavery and the Holocaust." *Masterpiece I*, 138 S. Ct. at 1729; Ex. 19 at 12. And past Commissioner Raju Jairam said that Phillips "cannot act on his religious beliefs 'if he decides to do business in the state,'" *Masterpiece I*, 138 S. Ct. at 1729; Ex. 17 at 23—a sentiment agreed with by Katina Banks,

another former commissioner and One Colorado board member. Ex. 17 at 23–24; *see also* Ex. 13 at 2; Ex. 16 at 1.

Without discovery or responses to public-records requests, Phillips has already learned of some current commissioners' opposition—and even animus—toward him and his religious exercise. When Commissioner Pocock, a former field coordinator for One Colorado, *see* Ex. 22 at 2; Ex. 23 at 1, discussed Phillips's first case in a series of 2013 tweets with Hess, she referred to Phillips as a "hater." Ex. 24 at 3–5. And Commissioner Aragon, a former One Colorado board member, *see* Ex. 13 at 2, and current LGBT liaison to Denver's mayor, *see* Ex. 25 at 1, posted a Facebook comment referencing the Supreme Court arguments in Phillips's first case with an image of the White House lit up in rainbow colors. Ex. 27 at 2. Aragon also serves with another group, the National LGBTQ Task Force, that filed an amicus brief against Phillips. Ex. 28 at 1; Ex. 29; Ex. 27 at 3. So despite commissioner changeover, the anti-Phillips sentiment remains.

## ARGUMENT

A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits, (2) irreparable harm, (3) the balance of equities favors an injunction, and (4) an injunction is consistent with the public interest. *Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1119 (10th Cir. 2014). All four requirements are satisfied here.

The preliminary injunction that Phillips seeks—enjoining the pending state proceeding— is not a disfavored injunction. It neither alters the status quo nor is mandatory. The status quo is "the last uncontested status between the parties." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005). That was before Colorado began its latest prosecution of Phillips. Because Phillips asks simply to enjoin that proceeding, he "seeks to preserve rather than disturb the status

quo." *Id.* Moreover, Phillips requests a prohibitory (not mandatory) injunction because (1) the requested relief, by forbidding further action in the state proceeding, would not "affirmatively require[] the nonmovant to act" but only bar Colorado from acting. *Id.* at 1261.

**I.      Phillips is likely to succeed on the merits of his claims because the pending state proceeding violates his constitutional rights.**

Phillips raises a free-exercise, free-speech, and due-process claim in support of the requested preliminary injunction. He is likely to succeed on each of those claims.

**A.      Phillips is likely to succeed on his free-exercise claim because state hostility toward his religious beliefs and practices pervades the pending state proceeding.**

State action "that is not neutral" toward religion "or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Government fails to act neutrally when enforcement officials manifest open hostility toward religious people or religious claims. *Masterpiece I*, 138 S. Ct. at 1729–30. And "[o]fficial action that targets religious conduct for distinctive treatment," *Lukumi*, 508 U.S. at 534—including "[a] rule that is . . . discriminatorily applied to religious conduct," *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004)—is neither neutral nor generally applicable. *See also Masterpiece I*, 138 S. Ct. at 1730–31. "The Free Exercise Clause bars even '*subtle* departures from neutrality' on matters of religion," and its protection applies "upon even *slight* suspicion that . . . state [actions] stem from animosity to religion or distrust of its practices." *Id.* at 1731 (quoting *Lukumi*, 508 U.S. at 534, 547) (emphasis added). When government hostility toward religion is blatant and egregious, litigants establish a free-exercise violation without needing to satisfy strict scrutiny. *See id.* at 1729–32.

The Supreme Court just held that Colorado violated these principles by acting with "a clear and impermissible hostility" toward Phillips's faith. *Masterpiece I*, 138 S. Ct. at 1729. The Court found "indication[s] of hostility" in (1) Colorado's discriminatory enforcement of CADA against Phillips and (2) commissioners' comments about Phillips and his faith. *Id.* at 1729–31.

This Court should enjoin the pending state proceeding because Colorado continues to exhibit both indicators of animus. First, as this Court has recognized, that proceeding reveals the state's continuing "disparate treatment" of and "hostility towards Phillips." Doc. 94 at 20–21. Second, officials who act as prosecutors and adjudicators in that proceeding have shown personal opposition toward Phillips and are now complicit in a private citizen's attempt to harass him.

### 1.    The state proceeding treats Phillips unequally.

The Supreme Court recognized that Colorado has created an "offensiveness" rule that allows cake shops to decline to express "messages [they] consider[] offensive." *Masterpiece I*, 138 S. Ct. at 1728. Colorado applied that rule when it issued no-probable-cause determinations in response to discrimination charges filed against the three cake shops that declined "to create cakes with images that conveyed [religious] disapproval of same-sex marriage." *Id.* at 1730; *see* Ex. 8 at 1–15. But the Supreme Court held that Colorado, because of its hostility toward Phillips's faith, treated him differently—both in the outcome of his case and in the way the state analyzed his arguments. *Masterpiece I*, 138 S. Ct. at 1730–31. Using an offensiveness rule to treat Phillips worse demeaned his faith by "elevat[ing] one view of what is offensive over another," which "itself sends a signal of official disapproval of [his] religious beliefs." *Id.* at 1731.

The pending state proceeding shows that Colorado continues its unequal treatment of Phillips. When Scardina filed the discrimination charge, Colorado should have issued a no-

probable-cause determination like it did in the three other cases. That's because Phillips, like the other shops, declined the request because of the messages that the custom cake would have admittedly expressed—celebration for a gender transition—a message he will not express for anyone. Am. Compl. ¶¶ 191, 193. Scardina's discrimination charge informed Colorado that Scardina told Masterpiece that the cake's "color and theme" would "celebrate [a] transition from male to female." Ex. 1 at 4. In response, Phillips told Colorado that his shop declined the request because he does not create custom cakes that express "messages and viewpoints on the subject of sex-changes or gender transitions—whether celebrating or denigrating them—for any customer." Ex. 2 at 3. He also said that it "would violate [his] religious beliefs" if he were forced to express the messages that the gender-transition cake communicated. *Id.* at 5.

But Phillips was not treated as the other three cake shops were. Rather than exonerating him because he declined to express a message that was offensive to his faith and that he would not communicate for anyone, Colorado cited his faith-based objection to expressing a message— "the idea that a person's sex is anything other than an immutable God-given biological reality"— as the sole basis to conclude that Phillips engaged in status-based discrimination against Scardina. Ex. 4 at 3–4. "[T]his disparate treatment reveals [Colorado's] hostility towards Phillips . . . motivated by . . . his religion[]." Doc. 94 at 20–21.

Colorado's pursuit of the pending state prosecution defies the Supreme Court by mirroring in two ways the same unequal analysis that the high court already condemned. First, Colorado exonerated the three cake shops because they were "willing to sell other products . . . to the prospective customers," but it continues to "dismiss[] [Phillips's] willingness to sell [other cakes] to [LGBT] customers as irrelevant." *Masterpiece I*, 138 S. Ct. at 1730. Indeed, both the Division

and Commission have ignored that Masterpiece told them that Scardina "is welcome to purchase any of the cake shop's premade items or obtain a different custom cake." Ex. 2 at 3; *see also id.* at 6. Second, while Colorado did not require the other cake shops to show that the message of the requested cake would be attributed to the customer, it continues to insist that Phillips must lose because "any message the requested . . . cake would carry would be attributed to the customer, not to [him]." *Masterpiece I*, 138 S. Ct. at 1730. In fact, Colorado has made that exact argument to this Court. Doc. 75 at 12 ("Any message conveyed . . . is not attributable to the baker").

Colorado argues that no unequal treatment exists because while the three other cake shops would not express the requested messages for anyone, Phillips will create other "blue and pink cake[s]," including for Scardina. Doc. 94 at 21. But that argument, which this Court has already rejected, "defines the type of cake requested too generally." *Id.*; *see Masterpiece I*, 138 S. Ct. at 1738–39 (Gorsuch, J., concurring) (chastising Colorado for "gerrymander[ing]" the analysis by describing the cake requested from Phillips at a high "level of generality"). Colorado knew that Scardina did not request just a blue and pink cake. Scardina's discrimination charge said that Scardina requested that the cake "celebrate [a] transition by having a blue exterior and a pink interior" and reiterated that the "color and theme [would] celebrate [a] transition from male to female." Ex. 1 at 4. In other words, as this Court has recognized, "Scardina explicitly, and repeatedly, requested a blue and pink . . . cake to celebrate [a] transition, and Phillips would have declined to make such a cake for anyone, regardless of the 'customer's protected characteristics.'" Doc. 94 at 21–22.

Colorado's attempt to manipulate the analysis—applying a different "level of generality" in Phillips's case compared to others—exacerbates the free-exercise violation by failing to treat

Phillips's religion "with neutral respect." *Masterpiece I*, 138 S. Ct. at 1739 (Gorsuch, J., concurring). It also seeks to hide that Colorado is contradicting what it told the Supreme Court when it said that Phillips may decline to create cakes with designs or themes that express pro-LGBT messages. Ex. 10 at 35 ("Under the Act, Phillips is free . . . to *decline* to sell cakes with 'pro-gay' designs"). Considering what Scardina said about the intended message of the requested pink and blue color scheme, *see* Ex. 1 at 4, all Phillips did was decline to create a cake with a pro-LGBT design and theme. By ignoring what it told the Supreme Court and prosecuting Phillips anyway, Colorado confirms its hostility toward him.

### 2.   Commissioners involved in the state proceeding have exhibited bias against Phillips and his religious practices.

Current commissioners functioning as prosecutors and adjudicators in the pending state proceeding have manifested open opposition toward Phillips and his religious exercise. In a brazen show of hostility, Commissioner Pocock publicly referred to Phillips as a "hater" while mocking his faith-based decision not to create a custom wedding cake celebrating a same-sex marriage. Ex. 24 at 5. And Commissioner Aragon demonstrated his personal opposition to Phillips's religious exercise through a rainbow-theme Facebook post about the Supreme Court arguments in Phillips's prior case, Ex. 27 at 2, and his current service with a group—the National LGBTQ Task Force—that filed an amicus brief against Phillips, Exs. 28–29; Ex. 27 at 3. Allowing the state proceeding to go forward when it has been instituted by prosecutors and will be decided by adjudicators who have publicly opposed—and, in Pocock's case, derided—Phillips and his religious practices is inconsistent with the constitutional requirement of religious neutrality. This concern is heightened by the history of commissioner animus toward Phillips and his faith, *see Masterpiece I*, 138 S. Ct. at 1729 (discussing past commissioners' hostile

comments); *supra* at 7–8 (same); and the absence of any steps to disavow or correct that systemic hostility. *See Masterpiece I*, 138 S. Ct. at 1731 (noting that "[f]actors relevant to the assessment of governmental neutrality" include "the historical background").

Colorado further demonstrates its bias against Phillips by joining in Scardina's obvious attempt to harass him. Scardina requested the gender-transition cake just hours after the Supreme Court announced that it would hear Phillips's first case. Ex. 2 at 2. Scardina is an attorney whose website expresses a desire to file LGBT discrimination cases. Ex. 6 at 2. And Scardina later called Phillips and asked for a cake with satanic imagery—a request that came while Phillips was receiving other requests for cakes celebrating Satan, including one with a sexual theme. Am. Compl. ¶¶ 199, 307–20; *compare* Ex. 1 at 3, *with* Ex. 7 at 2. Despite all signs showing that Scardina sought to harass Phillips, by going along with it, Colorado has made that harassment its own.

As in *Masterpiece I*, the commissioners' bias against Phillips and his religious exercise—when combined with the unequal treatment—establishes, without needing to apply strict scrutiny, that the pending state proceeding violates Phillips's free-exercise rights and should be enjoined.

### 3.    The state proceeding applies a system of individualized exemptions and threatens to violate a hybrid of Phillips's rights.

At the very least, Colorado must satisfy strict scrutiny because the pending state proceeding (1) applies a system of individualized exemptions and (2) threatens to violate a hybrid of Phillips's rights. *See Axson-Flynn*, 356 F.3d at 1295 (recognizing that strict scrutiny applies to an "individualized exemption" and "hybrid rights").

First, governments establish "a system of individualized exemptions" when they apply "a subjective test" on a "case-by-case basis" to assess whether particular conduct is forbidden. *Id.* at

14

1297. The Supreme Court found that a subjective "good cause" standard is an individualized exemption. *Emp't Div. v. Smith*, 494 U.S. 872, 884 (1990). And the Tenth Circuit said that affording an exemption to one person suffices. *Axson-Flynn*, 356 F.3d at 1298–99. In the pending state proceeding, Colorado will apply its offensiveness rule—a standard that is subjective and viewpoint discriminatory. *Matal v. Tam*, 137 S. Ct. 1744, 1756 n.5, 1763 (2017) (plurality) (standard based on offensiveness is "highly subjective" and discriminates based on "viewpoint"). And as the cases with the three other cake shops show, Colorado applies that rule case by case to reach disparate results. The state has thus created a system of individualized exemptions.

Second, the "hybrid rights" doctrine applies "when a free exercise claim is coupled with some other constitutional claim (such [as] a free speech claim)." *Axson-Flynn*, 356 F.3d at 1295. A plaintiff must "show that the companion constitutional claim is 'colorable,'" which requires "a fair probability or likelihood, but not a certitude, of success on the merits." *Id.* at 1297. Colorado's prosecution of Phillips not only violates his free-exercise rights but also threatens his free-speech and due-process rights. Because Phillips is likely to succeed on the other claims, the hybrid-rights doctrine demands strict scrutiny, which, as explained below, Colorado cannot satisfy. *See supra* at 22–24.

**B.**    **Phillips is likely to succeed on his free-speech claim because the pending state proceeding threatens to unlawfully compel his expression.**

"Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command" and is "universally condemned." *Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). That rule forbids Colorado from forcing citizens to express messages they deem objectionable or from punishing them for declining to express such messages. *See Pac. Gas and Elec. Co. v. Pub. Utils. Comm'n of Cal.*,

475 U.S. 1, 20–21 (1986) (*PG&E*) (plurality) (business cannot be forced to include another's speech in its mailing); *Wooley v. Maynard*, 430 U.S. 705, 717 (1977) (citizens cannot be forced to display state motto on license plate); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (newspaper cannot be forced to print politician's writings); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (students cannot be forced to recite pledge or salute flag). Not even public-accommodation laws like CADA can override this freedom. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572–73 (1995) (parade organizers cannot be forced to include LGBT group's message); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000) (Boy Scouts cannot be forced to keep leader who contradicts group's messages).

The right to be free from compelled speech protects conscience by shielding "the sphere of intellect" and the "individual freedom of mind." *Wooley*, 430 U.S. at 714–15. It ensures that the government cannot force individuals to be "instrument[s] for fostering public adherence to an ideological point of view [they] find[] unacceptable." *Id.* at 715. And it protects "individual dignity," *Cohen v. California*, 403 U.S. 15, 24 (1971), because "[f]orcing free and independent individuals to [express] ideas they find objectionable"—to "betray[] their convictions" in that way—"is always demeaning," *Janus*, 138 S. Ct. at 2464.

"[T]o make out a valid compelled-speech claim, a party must establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action." *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) (*Cressman II*). By instituting a proceeding that will require Phillips to create the requested gender-transition cake, Colorado threatens to violate Phillips's free-speech rights.

### a.      The gender-transition cake is speech.

Scardina asked Phillips to create a cake with a design and theme that would have communicated admittedly intended messages. Ex. 1 at 3–4. It thus qualifies as speech, either artistic expression (i.e., pure speech) or symbolic speech.

*Artistic expression.* "[T]he Constitution looks beyond written or spoken words as mediums of expression," *Hurley*, 515 U.S. at 569, and protects artistic expression as pure speech. "The concept of pure speech is fairly capacious." *Cressman II*, 798 F.3d at 952. It includes "pictures, . . . paintings, drawings, and engravings," "custom-painted clothing," "stained-glass windows," *id.*, and tattoos, *Buehrle v. City of Key West*, 813 F.3d 973, 976 (11th Cir. 2015); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010).

Artistic expression also encompasses the custom expressive cakes that Phillips creates using skills like designing, painting, and sculpting. Am. Compl. ¶¶ 88–93. Phillips intends to and does in fact communicate messages through those cakes, which is why he declines requests that convey messages in conflict with his faith. Phillips Decl. ¶ 10. It matters not that Phillips creates his cakes using mostly edible materials like icing and fondant rather than ink and clay. "[T]he basic principles of freedom of speech . . . do not vary when a new and different medium for communication appears." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011).

The gender-transition cake is a means of expression. Scardina surely intended its design to communicate, requesting that its pink and blue "color and theme celebrate [a] transition from male to female." Ex. 1 at 4; *see Hurley*, 515 U.S. at 570 (focusing on the expressive purpose of the person seeking to access the public accommodation's speech); *Cressman II*, 798 F.3d at 954

(asking whether an image that a compelled speaker did not want to display was an expressive "act of creativity on the part of" the people requesting the image). Such a cake is a form of expression.

*Symbolic speech.* While the gender-transition cake is best categorized as artistic expression, it at least qualifies as symbolic speech. Symbolism is an "effective way of communicating ideas," serving as "a short cut from mind to mind." *Barnette*, 319 U.S. at 632. The Supreme Court originally adopted a two-prong test to evaluate whether something is symbolic speech: (1) whether "[a]n intent to convey a particularized message was present"; and (2) whether "the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). *Hurley* later erased the requirement that the message be "particularized." 515 U.S. at 569.

The Tenth Circuit has held that the first prong is satisfied in compelled-speech cases. Since "a compelled speech plaintiff does not *intend* to convey the unwanted messages, but is forced to," the court "view[s] the compulsion aspect of [a] compelled speech claim to satisfy any intent requirement." *Cressman v. Thompson*, 719 F.3d 1139, 1154 n.15 (10th Cir. 2013) (*Cressman I*).

Under the second prong, courts discern the message understood by the reasonable observer who sees the speech. That observer "focuses on context to give meaning to a symbol and is cognizant of . . . the environment in which an expressive act occurs." *Cressman II*, 798 F.3d at 958 (quotation marks and alterations omitted). He knows the "purpose," "motive," and intended "message" of the person who requests the speech. *Id.* at 959–60. Here, the observers of the gender-transition cake—people attending the celebration of the anniversary of Scardina's gender transition—would understand that the pink and blue design (the colors symbolic of girls and boys, respectively) reflected that transition and expressed celebration for it. That message

would have been especially clear because the transgender-pride flag is pink and blue in color. Ex. 30 at 3–4. Because the messages of that cake would have been understood by its viewers, it constitutes symbolic speech.

*Phillips is a speaker.* Businesses and individuals are constitutionally protected speakers when they create or distribute expression, even if the message originates with others and the speaker earns money. *See Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795–98 (1988) (fundraisers paid to recite customers' messages are speakers); *Wooley*, 430 U.S. at 715 (motorists displaying state motto on license plates are speakers); *Tornillo*, 418 U.S. at 258 (newspapers compiling others' writings are speakers). "Protected artistic expression frequently encompasses a sequence of acts by different parties, often in relation to the same [item]. The First Amendment protects the artist who [creates] a piece just as surely as it protects" those who request it. *Buehrle*, 813 F.3d at 977; *accord Anderson*, 621 F.3d at 1061–62. That is why tattooists who create what customers request, *id.*; *Buehrle*, 813 F.3d at 976; and "[p]ublishers" who "disseminat[e] the work of others" are protected by the First Amendment, *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 925 (6th Cir. 2003); *see also Hurley*, 515 U.S. at 574 (discussing "professional publishers").

Phillips's role in designing, sculpting, and hand-crafting the requested gender-transition cake, were he compelled to create it, would qualify him as a speaker. As Phillips does with all orders seeking custom expressive cakes, he exercised his expressive discretion over Scardina's request, declining it because the cake would have expressed messages he deemed objectionable. Am. Compl. ¶ 191; Phillips Decl. ¶ 8. Had the shop accepted the request, Phillips would have collaborated with Scardina about the best way to convey the desired message, sculpted the cake

into form, and decorated it with painting and sculpting techniques. Am. Compl. ¶¶ 86–94; Phillips Decl. ¶¶ 2–9. His work in bringing that expressive cake to life makes him a speaker.

### b. Phillips declined to create the gender-transition cake because he objected to the messages it would have communicated.

The compelled-speech doctrine applies when individuals like Phillips object to conveying a requested message. *Cressman II*, 798 F.3d at 951. It does not apply when a public accommodation refuses to serve people from a particular class. *Hurley*, 515 U.S. at 572. *Hurley* established this crucial message/person distinction in public-accommodation cases. There, the Court held that the compelled-speech doctrine shielded parade organizers' decision not to express an LGBT group's message through their parade. Critical to the Court's analysis was its recognition that the organizers declined the request because of a "disagreement" with the group's message rather than an "intent to exclude homosexuals as such." *Id.*; *see also Dale*, 530 U.S. at 653 (organizers in *Hurley* did not exclude LGBT group "because of their [members'] sexual orientations," but because of what the group expressed "march[ing] behind a . . . banner"). Because Phillips objects to the messages that the gender-transition cake would have conveyed and would otherwise serve Scardina, *see* Phillips Decl. ¶¶ 14, 16, 18, compelled-speech principles protect him.

### c. The pending state proceeding threatens to compel Phillips's expression.

The way that Colorado interprets CADA in the pending state proceeding threatens to compel Phillips's speech. Colorado is not applying CADA to force Phillips to sell his already-made products, like the cookies sold at his shop, or even to create non-expressive items, such as a tray of plain brownies. It is forcing him to hand-craft a custom cake with a design that the

customer admitted would express a message. This distinction between a compelled sale of a product and a compelled creation of expression is key to applying the compelled-speech doctrine.

Again, *Hurley* is illustrative. Public-accommodation laws like CADA "do not, as a general matter, violate the First or Fourteenth Amendments." *Hurley*, 515 U.S. at 572. They are constitutional "on [their] face" and in the vast majority of their applications. *Id.* But when states apply those laws to "essentially requir[e]" individuals "to alter" their expression—when they are "applied in [that] peculiar way"—compelled-speech principles provide a refuge. *Id.* Since that is how Colorado is applying CADA to Phillips in the pending state proceeding, it is violating his free-speech rights.

### d.      Strict scrutiny applies to Phillips's free-speech claim.

Before Colorado may force Phillips to create the gender-transition cake, it must satisfy strict scrutiny. That rigorous standard applies for two reasons. First, compelling speech "is always demeaning," *Janus*, 138 S. Ct. at 2464, and justifiable "only on even more immediate and urgent grounds than [compelled] silence," *Barnette*, 319 U.S. at 633. Second, Colorado applies CADA based on both content and viewpoint, thus demanding that strict scrutiny apply. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2231 (2015) (strict scrutiny applies when a law is content based).

Colorado's attempt to apply CADA in the pending state proceeding is content based for two reasons. First, the Supreme Court has recognized—and reaffirmed this past term—that "[m]andating speech that a speaker would not otherwise make necessarily alters . . . content" and constitutes "a content-based regulation of speech." *Riley*, 487 U.S. at 795; *accord Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (similar). Applying CADA to

force Phillips to craft the gender-transition cake mandates expression that he would not otherwise create. It is thus a content-based application of the law.

Second, a law is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S. Ct. at 2227. In compelled-speech cases, this occurs when state action is triggered, and requires a speaker to express another's message, because of content. *See PG&E*, 475 U.S. at 13–14 (plurality) (awarding one speaker "access" to another's expression because of the first speaker's "views" is "content based"). Colorado requires Phillips to create the gender-transition cake because it addresses a topic (a gender transition) that implicates a CADA classification (transgender status). *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992) (finding a similar law content based). Since Colorado "is punishing [Phillips] because he refuses to create . . . cakes that express" certain messages, it must satisfy "the most exacting scrutiny." *Masterpiece I*, 138 S. Ct. at 1746 (Thomas, J., concurring).

Worse yet, Colorado applies CADA to discriminate based on viewpoint in two ways. First, CADA forbids discrimination because of "transgender status," but does not protect any other gender identity. Colo. Rev. Stat. § 24-34-301(7). So while Colorado requires Phillips to create the gender-transition cake, it does not compel the same for a cake celebrating a "cisgender" affirmation. Second, Colorado applies CADA to allow cake artists to refuse cakes conveying some messages, but punishes Phillips when he declines to express messages that the state favors. Such viewpoint discrimination demands strict scrutiny.

### e.   Colorado cannot satisfy strict scrutiny.

Under strict scrutiny, Colorado must show that requiring Phillips to create the gender-transition cake "furthers a compelling interest and is narrowly tailored." *Reed*, 135 S. Ct. at 2231.

Governments that have applied public-accommodation laws like CADA to infringe free-speech rights have repeatedly been unable to satisfy constitutional scrutiny. *See, e.g.*, *Hurley*, 515 U.S. at 578–79; *Dale*, 530 U.S. at 659. Colorado fares no better here.

Colorado asserts an interest in eradicating discrimination. Yet that characterization of its interest is too broad. Strict scrutiny "look[s] beyond broadly formulated interests justifying the general applicability of government mandates" to see whether its standard "is satisfied through application of the challenged law" to "the particular" party. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006); *see, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 221–22 (1972) (assessing government's specific interest in forcing Amish children to attend school from ages 14 to 16 rather than its general interest in mandating school attendance). As *Hurley* illustrates, the analysis here focuses not on CADA's general purpose of preventing "denial[s] of access to (or discriminatory treatment in) public accommodations," but on its "apparent object" when "applied to [the] expressive activity" at issue. 515 U.S. at 578.

Colorado, therefore, must show that it has a compelling interest in forcing cake artists who serve all people to violate their conscience by creating custom cakes that reflect and express celebration for gender transitions. Unlike most applications of CADA, this has the "apparent object" of forcing cake artists like Phillips to create speech and thus to "modify the content of [their] expression." *Id.* But as *Hurley* said, permitting that would "allow exactly what the general rule of speaker's autonomy forbids." *Id.* Colorado thus cannot satisfy strict scrutiny.

Colorado does not advance its cause by invoking dignitary concerns. *Hurley* established that eliminating dignitary harm is *not* a compelling state interest where, as here, the harm is caused by a decision not to express a message. "[T]he point of all speech protection . . . is to shield just

those choices of content that in someone's eyes are . . . hurtful." *Id.* at 574. Because the offensiveness of an expressive decision cannot be the reason both "for according it constitutional protection" and for removing that protection, *Johnson*, 491 U.S. at 409, preventing dignitary harms is not a compelling basis for infringing the freedom not to speak, *see Masterpiece I*, 138 S. Ct. at 1746–47 (Thomas, J. concurring) (collecting cases). Moreover, Colorado has not eliminated dignitary harm by prosecuting Phillips, but simply shifted it onto him. As the Supreme Court said last term, compelling people to help express messages that violate their conscience "is always demeaning" and "universally condemned." *Janus*, 138 S. Ct. at 2463–64.

Nor can Colorado demonstrate narrow tailoring. Its efforts to achieve its asserted interests are vastly underinclusive, which "is alone enough to defeat" narrow tailoring. *Brown*, 564 U.S. at 802; *accord Reed*, 135 S. Ct. at 2231–32. Colorado allows other cake shops to decline requests for cakes expressing messages they deem objectionable, permitting those business owners to "discriminate" against certain messages. But it is punishing Phillips for declining to express celebration for a gender transition. This selective enforcement is decidedly underinclusive. Furthermore, less restrictive alternatives exist. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) (state must use "a less restrictive alternative"). For example, Colorado could apply CADA to ban person-based discrimination but to allow the limited class of business owners who create custom expression to decline when they object to communicating a desired message. *See Masterpiece I*, 138 S. Ct. at 1728 (affording such protection would be "sufficiently constrained" because there are "innumerable goods and services that no one could argue implicate the First Amendment"). Colorado cannot satisfy strict scrutiny.

**C.      Phillips is likely to succeed on his due-process claim because the risk of bias in the pending state proceeding is constitutionally intolerable.**

The Due Process Clause requires a fair trial before a "disinterested tribunal." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). Its protections rest on "objective standards that do not require proof of actual bias." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009). Those standards establish that due process is violated when (1) "there is an unconstitutional potential for bias" or (2) "the risk of actual bias . . . endanger[s] the appearance of neutrality." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905, 1908 (2016) (quotation marks omitted); *see also Taylor v. Hayes*, 418 U.S. 488, 501 (1974) (asking "whether there was . . . a likelihood of bias or an appearance of bias"). "[T]o perform its high function," due process demands that proceedings "satisfy the appearance of justice." *In re Murchison*, 349 U.S. 133, 136 (1955). These "stringent" rules "sometimes bar trial by [decisionmakers] who have no actual bias and who would do their very best to weigh the scales of justice equally." *Taylor*, 418 U.S. at 501.

Due process "preserves both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done," and affording each litigant "assurance that the arbiter is not predisposed to find against him." *Marshall*, 446 U.S. at 242 (quotation marks and citation omitted). "Both the appearance and reality of impartial justice are necessary to the public legitimacy of [a tribunal's] pronouncements and thus to the rule of law itself." *Williams*, 136 S. Ct. at 1909.

The pending state proceeding violates due process because "an unconstitutional potential for bias" exists and the requisite "appearance of neutrality" is absent. *Id.* at 1905, 1908. Five factors establish this.

First, as this Court has explained, the current commissioners' decision to file a formal complaint and launch a proceeding against Phillips demonstrates that they continue to treat him unequally. Doc. 94 at 18–21. That "disparate treatment," in this Court's words, reveals the commissioners' "hostility towards Phillips" and shows that they "are pursuing the discrimination charges against [him] in bad faith." *Id.* at 20–21. Following their work as prosecutors, *see* Colo. Rev. Stat. § 24-34-306(4), the commissioners are now set to serve as administrative adjudicators in the state proceeding, *see* Colo. Rev. Stat. § 24-4-105(14)(a) (outlining the agency's role as adjudicator); *Masterpiece I*, 138 S. Ct. at 1725 (the commissioners reviewed the administrative law judge's decision and "vot[ed] on the case"). But allowing prosecutors who are pursuing Phillips in bad faith—with hostility toward his faith—to jump on the other side of the bench and adjudicate the case violates basic notions of due process.

Second, putting aside the issue of bad faith, "there is an impermissible risk of actual bias" because of the commissioners' "significant, personal involvement" in a "critical" prosecutorial decision in the state proceeding. *Williams*, 136 S. Ct. at 1905. Deciding whether and "what charges to bring" against Phillips, as the commissioners have done, is a "critical" prosecutorial decision that disqualifies them from serving as adjudicators. *Id.* at 1907. Having made that decision, they "cannot be, in the very nature of things, wholly disinterested" in the outcome. *Id.* at 1906. There is an impermissible risk that they will be "psychologically wedded to [their] previous position." *Id.* (quotation marks omitted). That risk is especially great in the immediate

wake of the Commission's failed attempt to punish Phillips the first time. It would be very embarrassing for the Commission to launch another prosecution only later to admit it was wrong.[1]

Third, Commissioner Pocock has expressed personal animus toward Phillips by publicly tarring him as a "hater" and demeaning his faith-based decision not to design a wedding cake celebrating a same-sex marriage. Ex. 24 at 5. It is unconstitutional to force Phillips to proceed in a case before an adjudicator who has personally disparaged him. Neither the appearance nor the reality of fairness can possibly exist in such a case.

Fourth, Commissioner Aragon has demonstrated personal opposition to Phillips and his religious exercise through a Facebook post and his current role with a group that filed an amicus brief against Phillips. In addition, Aragon is charged by statute with representing pro-LGBT interests because state law mandates that he represent government interests and his government interests arise from his role as the LGBT Liaison to Denver's Mayor. Colo. Rev. Stat. § 24-34-303(1)(b)(I)(B); Ex. 21 at 1; Ex. 25 at 1. Given all this, his role in the pending state proceeding raises significant due-process concerns.

It is no answer to say that Pocock and Aragon are only two of the commissioners. "Due process entitles [Phillips] to a proceeding in which he may present his case with assurance that

---

[1] *Withrow v. Larkin*, 421 U.S. 35 (1975), does not undermine this argument. While *Withrow* held that the "combination of investigative and adjudicative functions" in the same administrative agency "does not, *without more*, constitute a due process violation," the Court emphasized that violations do occur when "special facts and circumstances" show that "the risk of unfairness is intolerably high." 421 U.S. at 58 (emphasis added). Over forty years later, the Court announced one of those "special" situations: where, as here, a person makes a critical prosecutorial decision—such as whether to file charges—and then adjudicates the case. *Williams*, 136 S. Ct. at 1905. And in this case, other "special facts" heighten the risk of unfairness. Those include the commissioners' bad faith in commencing the state proceeding and other evidence showing their hostility toward Phillips (e.g., Pocock's "hater" slur).

*no member* of the [tribunal] is predisposed to find against him." *Williams*, 136 S. Ct. at 1910 (quotation marks omitted) (emphasis added). "[E]xperience teaches us that each member's involvement" in "the collective process of deliberation" "plays a part in shaping the . . . ultimate disposition." *Id.* at 1909. Due process thus forecloses the Commission's prosecution.

Fifth, the commissioners were chosen by discriminatory criteria, further tainting the state proceeding. Colorado law mandates that a majority of commissioners be "members of groups of people who have been or who might be discriminated against because of" a CADA-protected characteristic. Colo. Rev. Stat. § 24-34-303(1)(b)(II)(A). This means that people from certain classes (groups not discriminated against) are excluded from most commissioner positions. Governments cannot select juries using such criteria. *See Batson v. Kentucky*, 476 U.S. 79, 86–87 (1986). The same rule should apply to other adjudicative bodies—like the Commission.

Finally, the availability of "judicial review, de novo or otherwise, . . . at the conclusion of the administrative proceedings" does not cure the denial of due process now. *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973); *see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 618 (1993) ("Even appeal and a trial *de novo* will not cure" an initial denial of due process). Phillips "is entitled to a neutral and detached [adjudicator] in the first instance." *Ward v. Vill. of Monroeville, Ohio*, 409 U.S. 57, 61–62 (1972). Unless this Court intervenes now, Phillips will be stripped of that right.

## II.   The remaining preliminary-injunction factors favor Phillips.

*Irreparable harm.* "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As explained above, allowing the

pending state proceeding to move forward will violate Phillips's First Amendment rights to free exercise and free speech. It will also violate his right to a proceeding that comports with due process "in the first instance." *Ward*, 409 U.S. at 61–61. When constitutional violations are involved, as they are here, "no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012).

But here, there is more. If the state proceeding goes forward, people with ill will toward Phillips will be empowered to harass him—and drag him through additional state prosecutions—by requesting custom cakes with designs that they tell him will express messages contrary to his faith. Allowing this threatens to drive Phillips out of business, which constitutes irreparable harm. *See Gibson*, 411 U.S. at 577 n.16 (noting that the lower court found "irreparable" harm "for which no adequate remedy is afforded" when a pending administrative proceeding threatened to force individuals from "their profession").

*Balance of equities*. The equities also favor Phillips because the law places a premium on protecting constitutional rights. So "the threatened injury to [Phillips's] constitutionally protected [rights] outweighs whatever damage the preliminary injunction may cause" Colorado. *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999). That is particularly true here, where the requested preliminary injunction will have practically no effect on Colorado's ability to enforce its laws. The preliminary injunction will temporarily prevent Colorado from punishing Phillips for declining to create the gender-transition cake that Scardina requested. But Colorado will remain free to enforce CADA in all other instances, including against Phillips.

*Public interest*. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Verlo*, 820 F.3d at 1127. Because that is what the requested preliminary

injunction will accomplish, the public interest lands decidedly on Phillips's side. Moreover, the general public interest in enforcing CADA will not be undermined by the injunction because, as mentioned above, Colorado will still have the authority to enforce that statute outside of the pending state proceeding. Accordingly, all of the preliminary-injunction factors support Phillips.

## **<u>CONCLUSION</u>**

Phillips wants to peacefully live out his faith through his work as a cake artist by serving all people while declining to express messages that violate his beliefs. The pending state proceeding—marked by unequal treatment of Phillips and commissioners who have demeaned him—leave no doubt that Colorado won't allow it. Phillips asks the Court to enjoin that proceeding so that he can return to the life he had before Colorado began targeting him.

Respectfully submitted this 18th day of January, 2019.

Attorneys for Plaintiffs:

*s/ James A. Campbell*

Kristen K. Waggoner (Arizona Bar No. 032382)
James A. Campbell (Arizona Bar No. 026737)
Jonathan A. Scruggs (Arizona Bar No. 030505)
Roger G. Brooks (North Carolina Bar No. 16317)
Jacob P. Warner (Arizona Bar No. 033894)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
kwaggoner@ADFlegal.org
jcampbell@ADFlegal.org
jscruggs@ADFlegal.org
rbrooks@ADFlegal.org
jwarner@ADFlegal.org

David A. Cortman (Georgia Bar No. 188810)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE, Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org

Nicolle H. Martin (Colorado Bar No. 28737)
7175 W. Jefferson Avenue, Suite 4000
Lakewood, CO 80235
(303) 332-4547
(303) 425-3201 (facsimile)
nicollem@comcast.net

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 18, 2018, the foregoing document and all its attachments

were filed with the Clerk of Court using the CM/ECF system, which will send notification of such

filing to the following:

LeeAnn Morrill
First Assistant Attorney General
Public Officials Unit
State Services Section
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6159
Facsimile: (720) 508-6041
leeann.morrill@coag.gov

Vincent E. Morscher
Senior Assistant Attorney General
Civil Litigation and Employment Law
Section
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: (720) 508-6588
Facsimile: (720) 508-6032
vincent.morscher@coag.gov

Grant T. Sullivan
Assistant Solicitor General
Public Officials Unit
State Services Section
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6349
Facsimile: (720) 508-6041
grant.sullivan@coag.gov

Jacquelynn Rich Fredericks
Assistant Attorney General
Higher Education Unit
State Services Section
1300 Broadway, 6th Floor
Denver, Colorado 80203
Telephone: (720) 508-6603
Facsimile: (720) 508-6041
jacquelynn.richfredericks@coag.gov

*Attorneys for Defendants*

*s/ James A. Campbell*
James A. Campbell

32